(Decided July 11th, 1865.)

---

THE MAYOR & CITY COUNCIL OF BALTIMORE, and others, *vs.*
AUGUSTUS BOULDIN, and others.

BALTIMORE CITY: STREETS, GRADING AND PAVING OF: MUNICIPAL COR-
PORATIONS, POWERS OF: NOTICE OF APPLICATION FOR GRADING AND
PAVING: ORD. OF M. & C. C. OF BALTO., No. 61, OF 1851, AUTHORIZED
BY ACT OF 1838, CH. 226.—The Act of 1838, ch. 226, sec. 1, invests the
Mayor and City Council of Baltimore with the power and authority to pro-
vide for laying out, opening, extending, *widening*, straightening or closing
up, in whole or in part, any street, &c., which, in their opinion, the public
welfare or convenience may require; to prôvide for ascertaining and levy-
ing damages and benefits, for granting appeals, for jury trials, &c., pro-
vided, nevertheless, that before they should proceed to execute any of the
powers thereby vested in them, at least sixty days' notice should be given
of any application which may be made for the passage of any ordinance,
by advertisement in at least two of the daily papers in the city of Balti-
more. The notice given, in two or more daily papers, was: "that applica-
tion will be made to the Mayor and City Council to widen Belair Avenue,
or North Gay Street, as laid down on Poppleton's Plat, from Point Lane
to the North Avenue." HELD:

1st. That the powers granted by this Act, are such as are essential to the
existence and expansion of a great municipality, and are confided to a
local legislature, selected by its citizens, for the government of its con-
cerns.

2nd. That it would be fatal to the objects for which these powers are dele-
gated, by the General Assembly of the State, to require all notices of ap-
plications for ordinances to carry into effect these powers, to specify, with
technical precision, the objects for which the application would be made;
such particulars would embarrass all the subsequent proceedings dependent

Mayor & C. C. of Balto., *et al.*, *vs.* Bouldin, *et al.*

on the notices, and render the rights acquired under them so precarious as to destroy all confidence in the local legislation of the city.

3rd. That the notice, in this case, was a sufficient compliance with the proviso of the Act above cited, in accordance with which Ordinance No. 61, of 1851, was passed.

4th. That the authority conferred, by this ordinance, on the Commissioners, "to widen and condemn North Gay Street, or Belair Avenue, to the width of which it is laid down on Poppleton's Map," was a legitimate exercise of the power conferred by the Act.

ORDINANCE OF M. & C. C. OF BALTO., No. 15, OF 1851, SECS. 1 AND 36,—"PROPRIETORS" AND "OWNERS" IN PURVIEW OF DEFINED: BALTO. CITY, STREETS, &c.—Sec. 1, of Ord. No. 15, of 1851, makes the authority for paving in any unpaved street, &c., to depend upon the application, in writing, of those representing a majority of the feet of ground binding and fronting on said street, &c., after giving seven days' notice, &c.,—making no distinction between condemned and uncondemned streets. Section 36 extends those regulations to all streets, lanes and alleys *opened*, but *not formally condemned*, as well as to such as have been regularly condemned by law or ordinance, provided the proprietors of all the lots binding on such street, &c., shall assent thereto. HELD:

1st. That "condemned as public," must be considered synonymous with *appropriated to the public*, or streets belonging to the public,—the means being put for the end.

2nd. That the right, by appropriation, had already been acquired by the city in so much of Belair Avenue as was a public highway prior to the ordinance directing it to be widened and condemned.

3rd. To constitute a "proprietor" or "owner," within the purview of said sections 1 and 36, does not require an absolute legal and equitable estate in fee, yet there must be such an interest as would protect the property to be affected from encumbrances which would prejudice the tenant in reversion, and secure to the city a full right of way.

4th. Those who have such a stake in the subject matter as that they could not encumber it without injury to themselves, would be qualified to make the application under the said secs. 1 and 36; if their title is an equitable title, in fee, depending on contract to be consummated, such an interest would be enough to protect the interest of the vendor from prejudice, by wanton applications.

5th. One holding an equitable estate in fee, accompanied by possession, or an interest equivalent to that of a tenant for ninety-nine years, renewable forever, an executor or administrator of such, a mortgagee or mortgagor in possession, or a vendee under a deed of trust, who subsequently acquires a title in fee, would be an "owner" or "proprietor," as contemplated by the said sections.

PRINCIPAL AND AGENT.—The signature of the Treasurer of a Church Corporation to an application under the said sections, ratified and confirmed

42      v.23.

Mayor & C. C. of Balto., et al., vs. Bouldin, et al.

by their payment of the tax levied on them, was as binding as if in pursuance of the most formal and legal prior authority.

———: ATTORNEY.—The signature to such an application by attorney, in pursuance of an express verbal request by a *trustee* and *cestui que trusts*, was sufficient; such authority would have been sufficient in law to bind their interests in a contract for sale made by their attorney,—and the authority of the *agent* need not be in writing, to bind the principal in such cases.

ORDINANCES OF M. & C. C. OF BALTO., No. 10, OF 1855, SEC. 8, AND No. 11, OF 1850—CONSTRUCTION OF.—Previous notice having been given by the Collector, as required by the latter of these ordinances, it was unnecessary for the Auditor to re-advertise under the former, in order to enable him to proceed to enforce the collection of the taxes, under the circumstances of this case.

ORDINANCE OF M. & C. C. OF BALTO., No. 17, OF 1850, SECS. 2, 4 AND 9—CONSTRUCTION OF.—Objections made to the legality and regularity of the proceedings of the Commissioners, under the 2nd and 4th of these sections, should have been taken advantage of by appeal, under the 9th section.

APPEAL from the Superior Court of Baltimore city.

This cause was heretofore before this Court, on an appeal from an order dissolving an injunction, having been heard below on a motion to dissolve, upon bill, answer and proof taken under the Act of 1835, ch. 380. The decision of the case, as then presented, will be found reported in 15 *Md. Rep.*, 18. The Court of Appeals, then, on the ground of the insufficiency of the answer to authorize the passage of the order appealed from, reversed the order, continued the injunction, and remanded the cause. On the present appeal, the whole proceedings and evidence are before the Court.

The bill òf complaint filed in the Circuit Court of Baltimore city, on the 16th of July 1857, alleged: That Augustus Bouldin, Harriet Bouldin, Henry Bouldin and Jane A. Bouldin were the owners of certain lots of ground binding and fronting on Belair Road, or Belair Avenue, in the city of Baltimore; that said property or lots of ground were advertised for sale, and would be sold, by William Fuller, Auditor, assuming to act under the authority of the Mayor and City Council of Baltimore; that said Belair Avenue was never regularly laid out or formally condemned as a

public street, in pursuance of any law or ordinance of the State of Maryland, or of the city of Baltimore, and that said complainants never assented that the several regulations prescribed by ordinance relative to streets, should be construed to extend to said Belair Avenue; that A. J. Bouldin, for himself and for a certain Owen Bouldin, and the complainant, Harriet Bouldin, filed with the City Commissioner of Baltimore city a written protest, dated August 8th, 1853, against the grading and paving of said Belair Avenue; that the said A. J. Bouldin, in his lifetime, and all of said complainants, at all times opposed the extending to said Belair Avenue the several regulations prescribed by ordinance, relative to streets which have been formally and regularly condemned as public streets; that on the 15th of June 1853, an application was made, in writing, to the City Commissioner, to grade and pave Belair Avenue, from Point Lane to North Avenue, and the grade of said Avenue established from Oliver street to the North Avenue, and the City Commissioner, 6th July 1853, postponed the determination of said application indefinitely, and nothing more was done in the matter of said application thereafter.

The bill further alleges, that another application was made, in writing, to grade and pave all of that part of Belair Avenue between Point Lane and North Avenue, and to establish the grade of said Avenue from Oliver street to North Avenue; and that neither of the said applications are signed by the proprietors or owners of the majority of the feet of ground binding and fronting on said Belair Avenue, between Point Lane and North Avenue; that the letter or power of attorney from Joseph T. Mears to Benjamin A. Lavender, constituting Lavender the attorney to sign a petition for the grading and paving of Belair Avenue, and which is dated July 1st, 1853, and is attached to the application of July 25th, 1853, does not authorize Lavender to sign a petition to establish the grade of Belair Avenue from Oliver street to North Avenue.

The bill further alleges, that the City Commissioner, upon the last application received by him, and dated the 25th

of July, A. D., 1853, established a grade for said Avenue; that said grade was not established by said City Commissioner in accordance with the laws of the State of Maryland and the ordinances of the city of Baltimore; that the said City Commissioner, contrary to the ordinances of the city of Baltimore, subsequently changed the grade of said Belair Avenue, between Ann and Choptank streets, upon a petition to said City Commissioner, which was not signed by the owners of a majority of the number of feet of ground binding and fronting on that part of said Avenue asked for to be re-graded, and without having given the notice required by the ordinances of Baltimore city.

The bill further charges, that there was not a contract in writing for grading and paving Belair Avenue, as is required to be done by the ordinances of the city of Baltimore; that the plat of the property binding and fronting on the part of Belair Avenue applied for to be paved, under the application aforesaid, is not such a plat as is required by the ordinances of the city of Baltimore; that the proceedings of the City Commissioner are irregular, illegal and void, and have created no liability in law upon said complainants, and are not liens on said complainants' lots of ground; that the proceedings of the City Auditor are irregular, illegal and void, from the many errors in his proceedings, and especially in this, that the Auditor did not give the legal notice to the holders or owners of the lots of ground, by advertisement, to pay the sums so alleged to have been assessed upon each of said lots of ground above described, and which said notice should have been given by said Auditor prior to advertising said property for sale, and that said Auditor, in his advertisement, states that said accounts are for the paving of Belair Avenue, when, in fact, they are for grading and paving Belair Avenue; that the bills or accounts for grading and paving Belair Avenue, from Point Lane to North Avenue, were withdrawn by P. Schneider & Company from the City Collector, and were subsequently returned to said Collector, and the duty and

authority of the Collector and of the Auditor to coerce payment of the same were determined, and could not again be revived.

The bill further charges, that the proceedings of the City Auditor tend to the impoverishment of the appellants, and to the irreparable injury of their freehold and leasehold estates and titles; and should said sale be made, it would subject them to long, numerous and vexatious suits at law, and cast clouds upon their titles; that they would be prevented from making any disposition of their lots, and the sale would subject them to such an injury as for which the law affords no adequate redress.

The respondents are required to bring into Court the record of proceedings of the City Commissioner, the City Collector and the City Auditor, in the matter aforesaid, or transcripts thereof. The bill prays for an injunction to restrain the respondents from selling the appellants' lot of ground, and for general relief.

On the 30th day of March 1858, the defendants filed their joint and separate answer, and admit that the defendant, William Fuller, had advertised said lots of ground of the complainants for sale, as set forth in the bill, and aver that the same has been advertised, after due notice, and after compliance in every respect with the said ordinances; that one of said lots of ground, at the time the assessment was made for paving Belair Avenue, was owned by A. J. Bouldin, who then held a life-estate in the same, as tenant by the courtesy; that said A. J. Bouldin has since departed this life intestate; that no administration has been had on his estate; and that at his death the said lot of ground passed to the said Augustus Bouldin and a certain Randolph J. Bouldin, as tenants in common.

The respondents neither admit nor deny the ownership of Harriet Bouldin, but leave her to prove the same. They admit the ownership of Jane A. Bouldin in the lot claimed by her, and aver that Belair Avenue has been regularly and formally condemned as a public street, and was condemned

and opened and made a public street and highway before the application to pave and grade the same was made; that whether the complainants ever assented that the several regulations prescribed by the ordinances relative to streets should be construed to said Belair Avenue, said respondents knew not, and aver that it was not material whether they did or not so assent.

The respondents admit the application to the City Commissioner, filed July 25th, 1853, and aver that it was made by the owners of a majority of the feet of ground fronting and binding on Belair Avenue, between Point Lane and North Avenue; that due notice was given by advertisement, and on the 10th day of September 1853, it was determined by the said City Commissioner, with the approbation of the then Mayor, to pave the same; that proposals were advertised for and received, and the contract to grade and pave was awarded to Frederick Crey and Patrick M. Holbrook, with the approbation of the Mayor; that, subsequently, Frederick Grey and Patrick M. Holbrook gave bond, with approved security, for the performance of the contract, and annexed to their answers certified copies of the said proceedings and the said bond. They further admit the application of June 25th, 1853, referred to in the bill, and aver that no determination was had in relation thereto, and that the same was abandoned before the application of the 25th of July was made. They also aver that the only power of attorney given by Joseph T. Mears to Benjamin A. Lavender, is that dated the 1st of July 1853, a copy of which forms part of respondents' exhibit No. 1, and deny that it was ever annexed to the application of the 25th of June 1853, and insist that if it had ever been annexed to the application of the 25th of June 1853, it might have been properly taken therefrom, after the said application was abandoned, and even before, and annexed to the application of the 25th July 1853; and that the said Benjamin A. Lavender was authorized, by the said Joseph T. Mears, to sign, as his attorney and as his agent, the said application of the 25th July 1853.

The respondents also aver that the City Commissioner did establish the grade of Belair Avenue, in conformity with the laws of the State of Maryland, and the ordinances of the Mayor and City Council of Baltimore, and that the change or alteration in the grade of Belair Avenue, from Ann street to Choptank street, was made by the City Commissioner, under and by virtue of ordinance No. 4, approved December 16th, 1853, and with the consent, in writing, of the owners of the majority of feet of ground binding and fronting on said part of Belair Avenue; and they deny that there were any such errors in the proceedings of the said City Commissioner as are charged in the bill, and aver that the said part of Belair Avenue had been formally and regularly condemned as a public street, as to the part applied for to be graded and paved, and that there was a grade properly established, in accordance with the ordinances of the City of Baltimore, for Belair Avenue, between Oliver street and North Avenue; that there was a proper contract, in writing, for grading and paving Belair Avenue; that the said application was signed by the owners and proprietors of the majority of feet of ground binding and fronting on the said part of Belair Avenue, between Point Lane and North Avenue; and that a proper plat was made of the said property binding and fronting on the part of the said Belair Avenue applied for to be graded under the said application; and that the proceedings of the said City Commissioner were, in respect to the said paving tax, in all respects regular, and legal and correct, and have created a legal claim against the Complainants in the said bill; and that the paving taxes assessed against the said property are liens against their respective lots of ground.

The respondents also aver that the City Commissioner did proceed, in due course of law, to assess the tax for the paving of the said part of Belair Avenue, and that the same was assessed and returned to the office of the Collector of the taxes for the city of Baltimore, by whom the same was received on the 27th of November 1854, and file a copy of

the tax so assessed as their exhibit No. 3; that by the 7th section of ordinance No. 10, of the Mayor and City Council of Baltimore, entitled "An ordinance supplementary to an ordinance entitled an ordinance providing for the appointment and compensation of a City Auditor, prescribing his duties, and for other purposes," approved March 9th, 1855, it was provided and it was made the duty of the City Collector for taxes to hand over to the City Auditor all the books containing charges for paving taxes, which had then been due and in arrear for more than one year, and which taxes it shall be the duty of the City Collector to collect; and that in like manner the City Collector was required, within five days after the annual levy in each and every year, to hand over and deliver to the Auditor all the books in his office containing charges for paving taxes, which have been due and in arrear for more than one year; and by the 8th section of the said ordinance, the Auditor was required to collect all such accounts as might be placed in his hands, in the same manner and by the same proceedings as the said City Collector might use and employ.

The respondents also state, that when the said ordinance No. 10 was passed, the said paving taxes for Belair Avenue had not been due for twelve months, and that on the 12th of March 1856, and before the annual levy was passed for the year 1856, John W. Richardson, Collector of taxes in the city of Baltimore, caused to be published, in the newspapers published in the City of Baltimore, the advertisement, a copy of which is annexed to the answer, and marked defendants' exhibit No. 4; that the parties owning the lots of ground described in the complainants' exhibit A. B., No. 1, altogether failed and declined to pay the amount of taxes due by them, and for which the said lots were responsible, it was determined to offer the same for sale, and that accordingly William Fuller, the Auditor of the city of Baltimore, caused to be inserted in the newspapers published in the city of Baltimore, the said advertisement marked complainants' exhibit A. B., No. 1, that the City Collector had

handed over to the said Fuller, as auditor, the books in his office containing paving taxes, &c., which had been due and in arrear for more than one year, and more than five days had elapsed after the annual levy for the years 1856 and 1857; and because upon the true construction of the said ordinance, it became the duty of the said auditor to collect the paving taxes for the paving of Belair Avenue, for which they were then in arrear. The respondents also aver, that the paving and grading of the said part of Belair Avenue, was commenced during the lifetime of Frederick Crey, by the said Frederick Crey and Patrick M. Holbrook, and before it was completed, Frederick Crey died; and that subsequently, Patrick M. Holbrook, with the consent of Crey's administrators, and with the aid of Schneider & Co., completed the grading and paving of said part of Belair Avenue; that their lots have been greatly benefited; that the complainants did not object to the grading and paving, while it was being done; that no objection in fact was made thereto, except by A. J. Bouldin, who claimed to act for himself, Owen Bouldin, and the complainant Harriet Bouldin, but whether with the authority of said Owen and Harriet they know not, and put complainants to the proof thereof; that if any objections were made thereto, no effort was made to prevent the grading and paving by an application to a Court of Equity, for an injunction.

The respondents deny the jurisdiction of the Court.

On the 22nd day of April 1858, the complainants filed exceptions to the answer, because of its being without oath thereto, because the said answer does not set forth all the acts and proceedings necessary to appear, for giving a right to charge the grounds aforesaid of the complainants, with the said paving and grading, or either; and because in other respects the said answer is deficient.

The complainants, to prove that Belair Road, now called Belair Avenue, was, and still is a public road, and not a public street, and to support the allegation in the bill,

43    v.23.

that the same was not a public street, within the meaning of the laws and ordinances, filed under the commission, the plats and returns of the Commissioners who laid out the said road and straightened the same; they also filed the deeds of the property fronting on said road, calling the same "Belair Road;" and also took the depositions of William Dawson, Jr., and Samuel George Spafford.

To support the allegation in the bill, that the applications to grade and pave Belair Avenue, were not signed by the proprietors or owners of a majority of the feet of ground fronting on said Avenue, between Point Lane and North Avenue; the Appellants filed copies of the applications to grade and pave said Avenue, and to establish the grade of Belair Avenue, from Oliver street to North Avenue. And also filed the City Commissioner's plat, showing that the whole number of front feet was 9,534 feet and 2 inches; and also filed certified copies of the deed to Joseph T. Mears, which, together with the deposition of Mr. Hinckley, show that said Mears, at the time of signing said application, was not the owner or proprietor of 615 feet of ground, for which Benjamin A. Lavender signed, as his attorney; and also filed certified copies of the titles of Mrs. Elizabeth M. Rodewald, showing that she, and not Frederick Rodewald, was the owner of 584 feet, for which H. Vonkapff professed to sign, as attorney of F. Rodewald; and also filed the plat referred to in Dawson's deposition, which shows that William Leach was the owner of but 372 feet, exclusive of the streets, when the said Leach signed for 613 feet, and said 613 feet includes the beds of streets, the mere naked fee-simple title of which was held by him. The said application to grade and pave is signed by A. L. Boggs, Treasurer, and does not state of what or for whom he signed for 336 feet. The whole number of feet signed for in the application of 25th July 1853, is 5,480 feet, from which deduct 1,776 feet, signed for by the above named parties, who, as the appellees contend, were not the owners

or proprietors within the meaning of the laws and ordinances, and it will leave 3,704 feet, which is 1,063 feet less than one-half of the number of front feet binding on Belair Avenue, between Point Lane and North Avenue.

The above mentioned plats, deeds, depositions and applications, were also filed and taken for the purpose of supporting the allegation in the bill, that there was not a grade established in accordance with the laws of the State, and ordinances of the city, for Belair Avenue, between Point Lane and North Avenue.

The above mentioned plats, referred to by Dawson as having been made by him, the paving plat of Belair Avenue, the deeds to Mears, and the proceedings in the matter of the re-grade, were filed to support the allegation in the bill, that the application to re-grade was not signed by the owners or proprietors of a majority, as required by the ordinance authorizing the re-grade.

To show that Belair Avenue was not paved and graded according to the grade established by the City Commissioner, the complainants took the deposition of Dawson, and filed the plat made by him.

The respondents to prove that Belair Avenue or North Gay street had been regularly condemned, produced the first return of the commissions for opening streets, and which had been quashed; they also produced a second return, and plat B, and a rough plat, from which plat A of said Avenue was made. To prove that the signers of the application to grade and pave Belair Avenue, from Point Lane to North Avenue, were the owners of a majority of feet fronting thereon, the respondents produced and and filed a copy of the application of the 25th July 1853, and a portion of the reports of sales of Edward and Edward O. Hinkley, trustees, and the deed from Aaron Vancamp to Wm. Leach, and others; and the deposition of H. Vonkapff, to whose evidence the complainants filed their exceptions; and to prove that the re-grade of Belair Avenue was properly made, they filed copies of the proceedings in

the matter of the re-grade. To prove the allegation in the answer, that Belair Avenue was paved properly, the respondents took the depositions of Gilbert H. Bryson and James Peregoy, (to the evidence of the said Peregoy the complainants filed their exceptions,) and to show that proper plats had been made, examined Gilbert H. Bryson. To show that the paving tax was properly laid, they filed a copy of the paving warrant of Belair Avenue; and to prove that the auditor had proceeded legally, filed, under the commission, a notice given by the City Collector, notifying the persons interested in the grading and paving of Belair Avenue, to pay, or that he would sell their lots of ground.

The notice under which the Ordinance No. 61, of 1851, was passed, (Respondent's Exhibit No. 4,) was in the following words : "Notice is hereby given, that application will be made to the Mayor and City Council, to widen Belair Avenue, or North Gay street, as laid down on Poppleton's plat, from Point Lane to the North Avenue; also to open Washington street," &c.

On the 3rd day of December 1858, the Circuit Court passed an order dissolving the injunction heretofore granted, and on the 10th December 1858, the appellants appealed : For the opinion of this Court, reversing the order appealed from, continuing the injunction and remanding the cause, see 15 *Md. Rep.*, 22.

On the 18th of December 1861, the defendant filed in the Court below, an amended and supplemental answer, supplying the defects and omissions of the previous answers.

On the 28th May 1863, on the petition of the complainants, the cause was transferred to the Superior Court of Baltimore city, and on the 8th of June the commission for testimony having been remanded, the following additional evidence was taken.

*Frederick Henkleman,* for the complainants, proved, that part of the 1,505 feet, for which he signed the application to pave Belair Avenue, was purchased by him from Mur-

ray's estate, and was bid in by William Leach for the deponent, the two Messrs. Hilberg and George W. Holmes; that the interest of said Holmes was purchased by the deponent and the Hilbergs, as he believes, before the signing of said application, and that he recollects but one deed from Leach and wife, to Francis Hilberg and others, being executed for this property, which is the complainant's exhibit "Leach."

*William Crichton,* for the respondents, proved, that in the year 1853, he was one of the Justices of the Second Presbyterian Church of the city of Baltimore, and that he believed Alexander L. Boggs was the Treasurer of the said Church at that time; and that at the time of the said application to pave Belair Avenue, the said Church owned the grave-yard fronting on said Avenue.

It was admitted that the signature of A. L. Boggs to the application was genuine; and that on the 21st March 1858, the second Presbyterian Church of the city of Baltimore, paid for the paving tax against their lot on Belair Avenue, the sum of six hundred and twenty-four dollars and ninety-two cents, to George M. Gill, acting for the Mayor and City Council of Baltimore, and for the pavers.

*William Leach,* for the respondents, proved, that he purchased, as agent of Henkleman and the two Hilbergs, a lot of $18\frac{1}{4}$ acres on the Belair Avenue; that to his knowledge, Holmes was not interested in the property when they purchased it, but that those for whom he purchased, took possession of the property after the purchase, and paid for it; that the 1,505 feet signed for by the deponent, Henkleman and the Messrs. Hilberg, included the said $18\frac{1}{4}$ acres, and that the deponent was never at any time interested in the 265 feet, marked on the plat "Complainant's Exhibit plat No. 3," as belonging to Hilberg and Henkleman.

*William S. Bryan,* for the complainants, proved, that the book then shown him,—being the second return of the Commissioners for opening streets in the city of Baltimore, in the matter of widening and condemning North Gay

street, dated March 21st, 1853,—was seen by the witness for the first time when he obtained it for the purpose of offering it in evidence in a suit brought by the late John Nelson, attorney for Benjamin A. Lavender, against Charles Rogers, in which suit the witness succeeded Mr. Nelson as counsel, and the suit was brought to recover benefits assessed against Charles Rogers, in the proceeding of the Commissioners above referred to, the plaintiff alleging that he was entitled to them as assignee of the city, in consequence of having paid the benefits assessed against the said Charles Rogers; that in the suit above referred to, which had been assigned to the Baltimore Cemetery Company, the defendant set up the defence as an offset, as against the benefits for which he was sued, that the city was indebted to him in the sum of one hundred and sixty-six dollars and two cents, which exceeded the amount of the benefits claimed,—this offset was allowed under the ruling of the Court, as extinguishing the claim for benefits; that the witness then, as attorney for the Baltimore Cemetery Company, claimed that he was entitled to receive from the city, the damages assessed in favor of Charles Rogers, equivalent to the amount of the benefits which he had extinguished by his defence of offset; Mr. Grafton L. Dulany, at that time city counsel, agreed with the witness in opinion, and he accordingly received from Mr. John A. Thompson, city Register, the money; that he believes that it was $161.43, and he gave him his receipt for it; that he believes this was in 1857, as near as he can now recollect the time, and the money had remained in the city Treasury up to the time of his receiving it; that he claimed it as attorney of the Baltimore Cemetery Company, which was the assignee of said Benjamin A. Lavender; that he received it for said Company, and paid it over to it, after deducting his fees, and conceived that he was attorney for both, the Company and Lavender, and does not recollect at this distance of time, how he described his agency in the receipt.

*John A. Thompson,* for the complainants, proved he was

the Register of the city of Baltimore, and had been such Register since 2nd of February 1856; that he had the control of the stock books of the Mayor and City Council of Baltimore, but had no knowledge of any five per cent. stock in the name of Caroline Rogers, or Samuel W. Rogers, trustee of Caroline Rogers, purchased with the proceeds of the damages allowed Charles Rogers, in the return of the Commissioners for opening streets referred to in the testimony of the witness, Bryan; that if such investment had been made, the evidence of it would appear in his office; that if any moneys had been paid to Mrs. Caroline Rogers, or to Mr. Samuel W. Rogers, as her trustee, the evidence of it would be in his office; that he has not made an examination, however, to ascertain if such evidences exist, and to do so would consume much time, which, at that particular time, he could not well afford, as he was much engaged then in making up stock transfers for July; that upon being shown the return of Belair Avenue, or North Gay street, above referred to, and his attention called to the advertisement of John J. Graves, City Register, of 23rd of March 1853, it appears by the entry on said books that the said return was handed to the Collector of City Taxes on the 25th of April 1853, and that it was returned by the City Collector to the City Register on the 1st of September 1853; that if, in this case, an appeal had been taken within the thirty days specified in the advertisement of the City Register, of 23rd of March 1853, the proceedings in this case would have been sent to the Court to which the appeal was prayed; that he inferred, from the pencil note, that the benefits were paid by B. A. Lavender, the said pencil marks appearing on the third leaf of the return above referred to, and which he read, as follows: "Assessment for benefits paid by B. A. Lavender, $161.93."

*Frederick Hilberg*, for the respondents, proved, that when the application to pave Belair Avenue was signed, for the fifteen hundred and five feet, by Frederick Hilberg, (the witness,) Frederick Hinkleman, Francis L. Hilberg and

William Leach were the owners of the land, and that Geo. W. Holmes, to the best of his recollection, had no interest in it at that time.

The complainants' exhibits "Latrobe," "Hinkley," and "Leach," and also the following agreement, No. 1, of counsel, were filed under the commission:

The complainants offered in evidence the paper writings marked R. No. 1, R. No. 2, and R. No. 3, and examined *Charles Rogers*, who proved as follows:

The paper writings, R. No. 1, R. No. 2, and R. No. 3, now shown me, are the title papers for the lot of eight hundred and eighteen feet, marked Charles Rogers, on complainants' exhibit, plat No. 3, filed in these proceedings. I have never at any time owned any property binding on Belair Avenue, between Point Lane and North Avenue; I reside on the Belair road, on the property described in the exhibits R. No. 1, R. No. 2, and R. No. 3, and have been residing there about twenty years; I knew Mr. Alexander Bouldin, I was with Mr. Alexander Bouldin, at the City Commissioner's office, when Mr. Bouldin left his protest there against the paving of Belair Avenue, under the application for paving, filed in this cause; Mr. Alexander Bouldin opposed the grading and paving of Belair Avenue before the City Commissioner. The property conveyed by Hinkley to Mears, under complainants' exhibit A. B., No. 5, adjoins the property on which I reside; I know the property conveyed by Latrobe to Leach, situate opposite to Greenwood, I advised Hilberg and Hinkelman to purchase said property. The ground purchased by Leach from Latrobe, trustee, contained about twelve hundred and forty feet, and begins at George Bowers' lot, and runs, as shown on complainants' exhibit, plat No. 3, up to the Associate Congregation grave-yard, which was bought by Hilberg and Hinkelman, and which is shown on said plat as having two hundred and sixty-five feet front; I know Mrs. Rodewald's property, it is about four hundred feet north of the property on which I reside. All the property on the said

Mayor & C. C. of Balto., *et al.*, *vs.* Bouldin, *et al.*

plat, marked Henry Rodewald, between Simpson's property and the Universalists' grave-yard, is part of the Greenwood property, sold by Hinkley, trustee, to Mrs. Rodewald.

Complainants' exhibit "Thompson" was here filed under the commission, and the said witness being cross-examined for the defendants, continued:

I signed the petition of which defendants' exhibit Z. No. 2, is a copy; I was not authorized by Mrs. Rogers to sign for her. The reason I signed the paper was, because Mr. Hoss, who was the City Commissioner, promised that if I would sign it, he would restore my hill again, and I mentioned it to Mr. Boyd, a member of the City Council, and he observed, "Rogers, you have been jockeyed." Mrs. Rogers did not know of my signing, at the time, but knew it afterwards, and she objected. I had no interest in the ground on the Avenue of any kind; I never measured the front of the lot marked Charles Rogers on the plat; I never measured the front of the lot marked Hilberg and Henkelman, nor the lot marked Henkelman and Hilberg; I am satisfied the distance cannot vary much from the quantity described on the plat, as I walk pass it every day, and am able to form a pretty clear judgment; I have never measured the lot marked Henry Rodewald. I mean, when I say "my hill," the hill in front of the entrance to the gate on the property where I reside.

*Simon J. Martinet*, for the complainants, proved as follows:

I have examined the plat marked complainants' exhibit plat No. 3; I know the location of Belair Avenue, or North Gay street; I am a surveyor. The North-west side of Belair Avenue, between Point Lane and North Avenue, measures, by the said plat, forty-seven hundred and forty-five feet eight inches, and the South-east side forty-seven hundred and eighty-eight feet six inches; North Avenue crossing Belair Avenue diagonally, makes the south-east side longer than the north-west side. An application to pave Belair Avenue, between Point Lane and North Avenue,

44    v.23.

would require signatures of owners of more than forty-seven hundred and sixty-seven feet one inch of ground binding and fronting on Belair Avenue, in order to make a majority of front feet; I have seen the exhibits R. No. 1, R. No. 2, and R. No. 3, and from the description of the property contained in the said exhibits, and the plat of Greenwood, filed in this cause, I am able to locate the property described in said deeds on complainants' exhibit plat No. 3, and I accordingly designate the same as the lot marked Charles Rogers. The property described in complainants' exhibit "Latrobe," is the lot marked Hilberg, Henkelman and Hilberg, on the said plat No. 3. The deed, "Latrobe," gives a front of seventy-five perches, which, in feet and inches, is twelve hundred and thirty-seven feet six inches. The deed from Hinkley to Van Camp, includes the lots marked on the plat No. 3, William Leach, C. W. Burgess, Major John Young, Charles Davis. The piece of ground of thirty feet front, marked on the plat No. 3, Henry Rodewald, is property described in complainants' exhibit A. B., No. 2. The lot marked James Howell, on the plat No. 3, is the property described in complainants' exhibit A. B., No. 4, comprises all those parts of the property marked William Leach, on the plat No. 3, and which are not included within the beds of the streets. The deed from Aaron Van Camp and wife to William Leach, as recorded in liber A. W. B., No. 430, folio 115, &c., comprises all that portion of Ann street, John street, and the westernmost of Wolf street, fronting on the south-easternmost side of Belair Avenue. The lines of Greenwood, as shown on the plat of Greenwood filed in this cause, extend from the parcel of ground marked heirs of William H. Murray, deceased, to the center of Chester street.

It was admitted that Alexander L. Boggs, treasurer of the Second Presbyterian Church, has been dead for many years.

*George M. Gill*, examined on the part of the defendants, proved as follows:

I was employed to collect the paving bills due for paving Belair Avenue, before John W. Richardson, who was the Collector of city taxes, advertised the property, as appears by respondents' exhibit No. 4; I know that the said John W. Richardson did advertise the same, in compliance with the then existing ordinances, and that before the property in this case was advertised by William Fuller, Auditor, I carefully examined the advertisements which had been previously made by John W. Richardson, and advised that, under the circumstances, there was no necessity for re-advertisement by the Auditor; I conferred with the City Counsellor, Mr. Dulany, on the subject, and we agreed in the opinion above expressed. I am unable, from memory, at this distant time, to state the details, but I am certain that I had before me the ordinance regulating the advertisement, that I carefully examined it, and directed that the advertisement should be made in pursuance thereof; I saw the advertisements at the time, and before the advertisement of Fuller was inserted, I ascertained that the first advertisements had been properly made by John W. Richardson; I am enabled to be thus certain and definite, because a question arose, whether, owing to the lapse of time between the two advertisements, there was not a necessity for a new advertisement on the part of the Auditor, who then had the control of the matter; I do not recollect how often, or in what papers, the advertisement of John W. Richardson (respondents' exhibit No. 4) was inserted.

The agreement of counsel, No. 1, referred to in the commission, is in the words and of the following tenor, to wit:

"At request of R. J. Bouldin, Esq., I have to say, that the payments for certain property sold by me, as trustee in the case of Murray *vs.* Murray, to William Leach, were made as follows, as per my ledger:

"1852, August 2nd, 5,007.40 x 10 int.

1853, Jan'y 11th, 5,137.99.

1854, Feb'y 18th, 5,468.84, paid by Hilberg.

June 9, 1863.                    JNO. H. B. LATROBE.

348 MARYLAND REPORTS.

Mayor & C. C. of Balto., *et al.*, vs. Bouldin, *et al.*

"Augustus Bouldin, *et al.*, *vs.* The Mayor and City Council of Baltimore, *et al.*—In this case it is admitted that the property described in the deed from John H. B. Latrobe, trustee, to William Leach, of the 21st of February 1854, filed in this case, was sold by said Latrobe, under a decree of the Superior Court of Baltimore city, on the 10th of July 1852, which was immediately reported to said Court, and finally ratified by the said Court; that the payments to said trustee, for the purchase money of said property, were made as shown by the certificate of said Latrobe, of the 9th of June 1863, herewith filed."

Exceptions were filed by the complainants to the amended and supplemental answers; and by the respondents to the averments of the bill, as insufficient to authorize the issuing and the continuance of the injunction. Exceptions were also taken on both sides to portions of the testimony, which it is unnecessary to notice particularly, the points decided in the case having no special reference thereto.

The cause having been set down for hearing, and submitted for final decree, the Court below, (MARTIN, J.,) on the 6th of July 1864, signed a decree overruling the motion to dissolve the injunction and making the same perpetual, from which decree the defendants appealed.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, COCHRAN and WEISEL, J.

*Geo. M. Gill* and *Wm. S. Bryan*, for the appellants :

1st. The first charge in the bill is, that Belair Avenue has never been regularly or formally condemned as a public street. This charge, like all others in the bill, is explicitly denied in the answer, which is put in under oath, to meet the requirements of the decision of the Court of Appeals in 15 *Md. Rep.*, 18.

The defendants' exhibit Z, No. 1, (admitted in evidence by agreement of counsel,) shows the notice that was given

in two of the daily newspapers in the city of Baltimore, as required by the Act of 1838, ch. 226. In pursuance of this notice, Ordinance No. 61 was passed, at January session 1851, and approved June 12th, 1851. The notice was sufficiently comprehensive, and the ordinance expressly provided for widening and condemning. Both notice and ordinance evidently contemplated, in widening the Avenue to the extent laid down on Poppleton's Plat, that everything was to be done necessary to make the widening effectual in law; and the obvious intent and object was, that Belair Avenue should legally become a street to that width.

The Act of 1838, ch. 226, (expounded in *Moale vs. Mayor*, 5 *Md. Rep.*, 314,) gives to the City Council full discretion in opening streets, restricting them to no particular lines, consequently they have a right to open a street over what had once been a road. If, therefore, Belair Avenue was not already a street to the extent of its original width, it became so by the proceedings under the ordinance, if they were valid in other respects. The Commissioners made a return which was quashed on appeal to the Criminal Court; they then made a second return, from which no appeal was taken. The effect of this second return, thus standing unimpeached, is to condemn all the ground requiring condemnation in Belair Avenue, from Point Lane to North Avenue, to the width laid down on Poppleton's plat.

It is said that the Commissioners assessed damages for only ten feet of ground on the avenue, assuming that the residue had already been condemned, and was already a street; whereas, they ought to have assessed damages also, for the benefit of the owners of the bed of the Avenue, as it was previous to the widening; that they still held the fee in that ground, and that it could not become a street until that fee was divested out of them, and vested in the city, and that this could be done only by assessing them damages for said fee, which, it is said, ought to have been nominal.

350        MARYLAND REPORTS.

Mayor & C. C. of Balto., *et al.*, vs. Bouldin, *et al.*

In the first place, it may be answered, that if the owners of the fee in the bed of the Avenue, or any other persons, were aggrieved by the assessment of the damages, they ought to have appealed to the Criminal Court, ( as permitted by section 9 of Ordinance No. 17, Revised Ordinances of 1850, authorized by Act of 1838, ch. 226. ) And, not having appealed, the assessment cannot be attacked in this collateral way. *Methodist Church Case,* 6 *Gill,* 400.

In the next place, the Commissioners were right in considering the Avenue as already a street. It was condemned as a public highway in 1793; it was brought within the limits of the city, by the Act of 1816, ch. 209; it was laid down on Poppleton's plat, made in pursuance of Act 1817, ch. 168, section 12; and the testimony of witnesses shows that their personal recollection of its use as a highway, runs back to 1818. If it were possible to impeach the assessment of the Commissioners at this time, ( which is not the case, ) the continuous use of this highway for public purposes, for more than half a century, without objection from any quarter, would at least shew a dedication to the public; and in case of a dedication, the original owners, by the express decision of the Court of Appeals, in *Moale vs. Mayor, &c.,* 5 *Md. Rep.,* 322, are not entitled to even nominal damages. There is no difference between the rights of the original owners in the case of a street within the city, and any other public highway. *Kane vs. Mayor,* 15 *Md. Rep.,* 240 – 250. *People vs. White,* 11 *Barbour* (*N. Y.* ) *R.,* 26. In many cases the owners have conveyed the fee to the city by deed, and the same has been effected by special Acts of Assembly; and in the case of the North Avenue Boundary, they are authorized to do so, in consideration of the payment of the paving tax by the city, ( 2 Code, Art. 4, sec. 860 ; ) but the city does not obtain the fee by the condemnation, which is regulated by the Act of 1838, ch. 226. There is a special statute relative to the streets in the city of New York, providing that the fee shall be vested in that city by the condemnation. The cases all

show that this is in derogation of the general rule of law. *New Orleans vs. The United States*, 10 *Peters*, 713. *Harris, et al., vs. Ellicott*, 10 *Peters*, 53.

The return of the Commissioners show that they strictly complied with the ordinance. This return was deposited in the Register's office in obedience to sec. 8 of Ordinance No. 17, Revised Ordinances 1850, and is very different from the record which they were required to keep by sections 3 and 4 of the same ordinance.

It is said that a sum should have been invested for the benefit of Caroline Rogers, and that for default of this, the opening of the street was unlawful. Thompson's testimony leaves it unproved, whether any money was invested for her or not. The Commissioners assess no damages to be paid to her, and there is no competent evidence that she owned any land on the Avenue. If she was aggrieved by the non-assessment of damages to her, she ought to have appealed, and the propriety of the decision of the Commissioners on that head cannot now be inquired into. Non-payment, or non-investment of damages, cannot have the effect of annulling the condemnation.

The Commissioners having failed in their first attempt to assess the damages, were right in proceeding with the second. *Bruyn vs. Graham*, 1 *Wend.*, 370. *Hamilton vs. R. R. Co.*, 1 *Md. Rep.*, 553.

2nd. The second charge in the bill is, that the application to pave was not signed by the majority of owners required by Act of 1817, ch. 168, sec. 18. The whole extent of ground paved was ninety-five hundred and thirty-four feet two inches; one-half of this is forty-seven hundred and sixty-seven feet one inch. The number of feet signed for in the second application, is fifty-four hundred and eighty feet, and B. R. Mears signed the first application for six hundred and fifteen feet, but did not sign the second. (Complainants' exhibits X No. 1, and X No. 4.) As, however, the first application was before the Commissioner at the time the paving was determined on, and as B. R. Mears

had never withdrawn his assent, these six hundred and fifteen feet should be counted. This makes the number of feet, represented by owners assenting to the paving, six thousand and ninety-five.

The first ownership attacked is that of Joseph T. Mears. Complainants' exhibit A. B., No. 5, shows that Mears obtained his deed from Hinkley, June 22nd, 1854. But the same deed shows that the property was sold in 1847, to one Van Camp, by Hinkley, as trustee, appointed by a Court of Equity, and in the same year the sale was finally ratified; and on the 13th day of December 1852, Mears acquired the title thus sold to Van Camp, and afterwards, when all the purchase money had been paid, obtains Hinkley's deed. This title represents six hundred and fifteen front feet. It related back to the sale when the purchase money was paid and the deed executed. *Hunter vs. Hatton*, 4 *Gill*, 115.

Vonkapff's signature is next attacked. His testimony shows that he was authorized by Frederick Rodewald, Mrs. E. M. Rodewald, and her husband, Henry Rodewald. It was not necessary that he should have been authorized in writing. This signature represented five hundred and eighty-four feet. But Mrs. Rodewald's separate property fronts only thirty feet. (See *Martinet's testimony*.)

William Leach is next objected to, because he signed for the beds of Ann and John streets. (Complainants' exhibit A. B., No. 4.) The Commissioner's plat and the deed from Van Camp and wife to Leach, filed by defendants, shows that Leach owned the land on each side of these streets, and also the beds of the streets. He was, therefore, as much the owner of the beds of the streets as of any other property which he possessed; and he would be entitled to full damages for it, if these streets should be opened. *Moale vs. Mayor, &c.*, 5 *Md. Rep.*, 314.

No person was entitled even to an easement in this ground. Ann street fronts on the Avenue ninety-eight feet, and John street ninety-three feet. (*Dawson's second deposition.*)

Boggs' signature is objected to. The first application to pave, (complainants' exhibit X, No. 1,) shows that he was

the treasurer of the Second Presbyterian Church. It is proved by Crichton's testimony that he was treasurer, and it is admitted that the Church paid the tax charged against their lot on Belair Avenue. Its number of front feet is three hundred and thirty-six. The death of Boggs is admitted. It was the duty of the Commissioner to ascertain the authority of Boggs, and it is a fair presumption that he performed this duty. A jury would hold, under the circumstances, that he had authority to sign.

Leach, Hilberg, Henkleman and Hilberg signed conjointly for fifteen hundred and five feet. Of these feet, twelve hundred and thirty-seven feet six inches are comprehended in the deed marked "Latrobe," (Martinet's testimony.) It is said that Holmes had some interest in this property at the time; the contrary, however, is shown by Henkleman's testimony, and by Leach, who was twice examined. The deed from Leach and Holmes to Henkleman and the Hilbergs, (executed after the application to pave,) is not competent to show title in Holmes. The agreement of counsel with respect to Mr. Latrobe's statement, shows that Holmes never paid any of the purchase money, and that the sale was made and ratified long before the application to pave. The principle of *Hunter vs. Halton*, 4 *Gill*, 115, will apply to this signature.

The power of attorney from Mears to Lavender, was not executed until after the first application, and it contained an express authority to sign a petition for grading as well as paving. (Complainants' exhibit X, No. 4.) There was also a confirmatory power from Mears, filed with complainants' exhibit X, No. 6. The power of attorney first given to Lavender, limited him to no particular time, but was intended to authorize him to give Mears' assent to the paving and grading, and, by virtue of it, he might have signed a dozen papers to manifest this assent, if necessary. Any dealings between Lavender and Hilberg, to induce the latter to assent to the paving, are manifestly of no importance in this inquiry.

3rd. The bill charges that the grade was established on the application aforesaid, (of 25th of July 1853,) by the City Commissioner, and that it was not established in accordance with the laws of the State, and the ordinance of the city, (no specific objections are stated;) and that the grade was afterwards unlawfully changed.

In pursuance of the application of July 25th, the Commissioner established the grade of a portion of the street; that is to say, he fixed the angle of elevation at which the road should ascend; this was clearly within his powers after he had determined to pave,* even if the application had said nothing about grading. The ordinances evidently consider an application to pave, as including one to grade. Rev. Ordinances 1850, No. 15, secs. 2, 5, 11. He was authorized to change the grade of another portion by ordinance No. 4, approved December 16th, 1853, and a majority of the owners assented to the change of grade. (Complainants' exhibit X, No. 6.) An appeal was taken under sec. 12, Ordinance No. 14, Revised Ordinance 1850, (defendants' exhibit M, No. 1,) and his decision was sustained. But, as no grading had actually been done, he might have changed the angle according to which the work was to be done, without any ordinance or any assent of a majority. The Act of Assembly of 1829, ch. 114, evidently refers to a case in which the work had actually been done. But, if this be otherwise, the grade which was changed ought to have been established, originally, in conformity with the Act of 1835, ch. 390, which requires the assent of a majority of owners; this street not having been opened (to the full width) when this grade was fixed originally by the Commissioner. There is no evidence that an application to grade was made by any owners previously to the one under which the grade was changed. The first grade must then be considered as illegally established; and what is called the change of grade, is, in fact, the original grade, which it was clearly within the competency of the Commissioner to establish.

4th. Other errors are charged in the proceedings of the

City Commissioner: that there was no contract, in writing, for grading and paving. Complainants' exhibits X, No. 14, and X, No. 15, show a proposal for paving and grading, in writing, by the pavers, and an acceptance, in writing, by the Commissioner's clerk, and an approval, in writing, by the Mayor; and respondents' exhibit No. 2, is the paving bond executed by·them, and approved by the Mayor. That there was not a proper plat: *Vide* Bryson's testimony. That the proceedings were irregular, in regard to the tax: *Vide* respondents' exhibit No. 3, and Rev. Ord. 1850, No. 15, section 6.

It will be seen that many of the alleged errors and omissions related to provisions of the ordinances merely directory, and by no means essential to the validity of the acts of the officers concerned. As to the rule of law in cases where the power of a public officer has once legally attached, and the matter is confided to his judgment: *United States vs. Arredondo*, 6 *Peters*, 729, 730.

5th. The respondents show, in their answer, the proceedings of the Collector and Auditor, and the construction of ordinance No. 10, of 1855, on which they now rely. *Vide* Mr. Gill's testimony; complainants' exhibit A. B., No. 1; and defendants' exhibit No. 4.

6th. The charge about the withdrawal of the paving bills is not sustained, and has been abandoned by the complainants' counsel.

7th. It is clear that where a tribunal of limited jurisdiction acts within the scope of its powers, and its jurisdiction attaches, then its proceedings cannot be reviewed, and no mistake or error, on its part, can be availed of to set aside or annul its proceedings. *Williamson vs. Carman*, 1 *G. & J.*, 212. *People vs. Whiteside*, 23 *Wend.*, 277.

It is not sufficient to show error in the proceedings of tribunals of limited jurisdiction, the party complaining must show that he has been injured. *Lunt vs. Hunter*, 16 *Me. R.*, (4 *Shepley*,) 9. *People vs. Mayor, &c., of N. Y.*, 2 *Hill*, 9.

This will dispose of all the questions in this case, except

the question whether Belair Avenue was a legally con-
demned street, and whether the proprietors of a majority of
feet applied for the pavement. The City Commissioner had
nothing to prevent his jurisdiction from attaching, if the
street was condemned, and the majority of proprietors ap-
plied to grade and pave. Any mistake made by the Com-
missioner, if he did make any, can be remedied, not col-
laterally, but by a direct suit at law.

8th. The Belair Avenue, as shown by the testimony of
O. Bouldin, had been paved, as a public street, from Bridge
street to Point Lane, many years before the proceeding in
this case. The part from Point Lane had been opened and
used as a public highway, in connection with the part to
Bridge street, for a half century. Belair Avenue was lo-
cated as a street fifty feet wide, on Poppleton's plat, in 1817
or 1818; hence, the only thing necessary to be done, was
to widen it by ten feet; hence, the application to the City
Council.; hence, the ordinance and the condemnation un-
der it. No damages could be claimed or allowed for the
bed of Belair road. The condemnation of the street in-
flicted no injury, and 'whatever rights proprietors had to
this bed when it was a road, they now have, since it became
a street. The ordinance in relation to paving, draws a dis-
tinction when streets are opened and condemned, and those
opened and not condemned by law or ordinance; the signa-
ture of a majority being sufficient for the former, but it be-
ing necessary that all should unite in the latter; a street
must be condemned by law or ordinance. If condemned,
then the majority can cause it to be paved. What is meant
by condemnation? Dedication, with long continued use,
must be considered a condemnation. Because, in this case,
there can be nothing to condemn. It would be an absurdi-
ty to require a mere formal condemnation. In this case,
however, if a formal condemnation was necessary, there
was a formal condemnation by the ordinance. If, there-
fore, the Act of 1838 was not complied with, there was no
necessity in this case so to comply, since a simple ordinance

to condemn, so far as respects the fo. 'y feet, would have sufficed.

In regard to the original propriety of the injunction, as argued in the appellees' fourth point, in addition to what is stated in the brief used in the Superior Court, we add, that we rely upon the exceptions taken to the bill; and on the first exception refer to *Union Bank vs. Poultney*, 8 *G. & J.*, 332; *Nusbaum vs. Stein, et al.*, 12 *Md. Rep.*, 318; on the second exception, to *McElwain vs. Willis*, 9 *Wend.*, 561; *Champlin vs. New York*, 3 *Paige*, 573.

*Bernard Carter* and *R. J. Bouldin*, for the appellees, argued :

1st. That on the 25th July 1853, when the application to pave the Belair Avenue between Point Lane and North Avenue, was presented to the City Commissioners, the said Belair Avenue was not a formally condemned street in the purview of the Ordinance No. 15,—Revised Ordinances 1850; and that therefore, under the 1st and 36th sections of said ordinance, no jurisdiction could be vested in the City Commissioners to pave said Avenue without the assent of the proprietors of all the ground fronting on the Avenue between the points named; and that therefore the proceedings of the Commissioners in determining to pave said Avenue, were *coram non judice*, and absolutely void.

2nd. That even if the Belair Avenue between the points named, was a formally and legally condemned street within the meaning of said ordinance—No. 15, Revised Ordinances 1850—so that the assent of the owners of the majority of front feet binding thereon, was sufficient to vest jurisdiction in the City Commissioners to pave said street under said ordinance; yet that in this case the application presented to him on the 25th July 1853, and on which, alone, the determination to pave was made, was not signed by such majority of owners.

3rd. That admitting that the Belair Avenue was a street in such a sense as under said ordinance—No. 15, Revised

Ordinances 1850—could be paved on the application of a majority of owners, and admitting, also, that the application filed the 25th July 1853, was signed by such a majority, yet, that in point of fact, the Belair Avenue, as it existed at the time of such application, has never been paved at all; because subsequently, to wit, in December 1853, the grade of the larger part of said street was altered contrary to law, and the Avenue as it existed on the 25th July 1853, ceased to exist.

4th. That admitting all the last three propositions to be untenable, and the paving tax, imposed on the property of the complainants, to be in fact a valid lien thereon under said ordinance—No. 15, Revised Ordinances 1850,—yet that the sale enjoined by the injunction originally issued in this case, was properly enjoined, because there had not been given the requisite notices, made by said ordinance necessary preliminaries to such threatened sale.

We propose to discuss under these four points, all the questions which seem to us to arise in this case :

I. It is clear from an examination of sections 1 and 36 of No. 12, Revised Ordinances 1850, that the streets in the city of Baltimore, are divided into two classes or categories, so far as the paving of them is concerned; these classes are designated as "opened" streets; and, secondly, "formally condemned," or "condemned" streets.

The application to pave Belair Avenue between Point Lane and the North Avenue, presented on the 25th July 1853, and on which all the paving proceedings were based, was not signed by all of the proprietors of ground binding on the same. Unless, therefore, the Belair Avenue, in this part of it, was at that time, not only an opened street, but a formally condemned one in the sense in which those words are used in the said Ordinance No. 15, (sections 1 and 36,) it is plain that the proceedings of the City Commissioners in the matter, were *coram non judice*, and void. *Eschback vs. Mayor & C. C. of Balto.*, 18 *Md. Rep.*, 276. *Henderson vs. Same*, 8 *Md. Rep.*, 352. *Holland vs. Same*, 11 *Md. Rep.*, 186.

The inquiry therefore is, was the Belair Avenue a formally condemned street of the city of Baltimore, within the meaning of said ordinance ?

To determine this question, it is necessary to ascertain what is a "formally condemned" street of the city of Baltimore.

Now the literal construction of the 36th section of this ordinance would limit the terms "formally condemned street," to a street which had been condemned, that is, made a street, under the proceedings specified in Ordinance No. 17, Revised Ordinances 1850, which was passed under the authority given by the Act of 1838, ch. 226. Accordingly the defendants, in order to show that the Belair Avenue was a condemned street, rely, in the first place, on the Ordinance No. 61 of Ordinances of 1851, and the proceedings of the Commissioners for opening streets had thereunder, which said ordinance and proceedings they have given in evidence in this case.

The condition precedent in sec. 1 of the Act of 1838, ch. 226, is the giving by the city authorities at least sixty days' notice of any application which may be made for the passage of any ordinance to execute any of the powers vested in them by the Act. The omission to give this notice sixty days prior to the passage of an ordinance to open, widen or close any street would make the ordinance, and all proceedings under it, a nullity cannot be an open question. *Williamson vs. Carman*, 1 *G. & J.*, 196, 197, 198. *Mayor & C. C. of Balto.*, *vs. Porter*, 18 *Md. Rep.*, 284. *Owings, et al.*, *vs. Worthington*, 10 *G. & J.*, 283. *Alexander et al.*, *vs. Mayor & C. C. of Balto.*, 5 *Gill*, 398.

We contend, that unless the said forty feet of the said Belair Avenue, to wit, that which was the Belair road, was at the time of the passage of the Ordinance No. 61 of 1851, already a condemned street, it is not now a condemned street; because the only notice given under the requirements of the Act of 1838, ch. 226, was a notice that application would be made to the Mayor and City Council, to widen Belair Avenue. This notice was in these words :

"Notice is hereby given that application will be made to the Mayor and City Council, to widen Belair Avenue or North Gay street, as laid down on Poppleton's plat, from Point Lane to the North Avenue. Also, to open Washington street from," &c.

It was under this notice that the Ordinance No. 61 of 1851, was passed. It is clear, therefore, that under the proviso to the first section of the Act of 1838, ch. 226, the only ordinance that could validly be passed under this notice was an ordinance to widen the Belair Avenue, and, of course, in order to widen a street, that which is to be widened must exist as a condemned street of some dimensions. 1 *G. & J.*, 197, above referred to.

But it is clear that the ordinance does not profess to authorize anything but the condemnation of the ten feet which was to be added to the forty feet occupied by the Belair road, in order to make the fifty feet, which was the width of the Belair Avenue, as laid down on Poppleton's plat.

The language is " to widen and condemn it to the width of which it is laid down on Poppleton's plat;" it is not said of the width; and if it had been intended to condemn the forty feet as well as the ten feet, all use of the word " widen," would have been superfluous and inapt; the language would simply have been " open and condemn Belair Avenue, as laid down on Poppleton's plat." Nor did the Street Commissioners profess or pretend, when acting under this ordinance, to more than condemn the ten feet; the book of their proceedings and their condemnation plat filed in the cause, all show this.

Unless, therefore, the forty feet of the Belair Avenue, which existed as the Belair road, made under the Act of 1791, ch. 70, was a formally condemned street of the city of Baltimore, at the time of the passage of the Ordinance No. 61 of 1851, it is clear, that it was not made so under the said ordinance; and that therefore, on the 25th July 1853, the Belair Avenue was not a street which could be paved by the assent of the owners of a majority of front feet.

The inquiry then comes, was the said forty feet, Belair road, a condemned street of the city of Baltimore, at the time, and independent, of the passage of Ordinance No. 61 of 1851 ?

In order to determine this question, it is only necessary to ascertain what are the characterizing and constituent elements of a "formally condemned street" in the city of Baltimore.

We refer, first, to the legislation of the State on this subject. See the Acts of 1817, ch. 168, secs. 9 and 10, 16 and 17; 1824, ch. 105; 1844, ch. 224; 1843, ch. 309; 1853, ch. 360; 2 Code, Title Balto. City, sec. 869. No. 17, Rev. Ord. 1850, secs. 20 and 21.

These citations suffice to show that the Legislature of Maryland intended that the Mayor and City Council of Baltimore should have the complete and entire title to the ground covered by the streets of the city of Baltimore, so that they might exercise all the control over them necessary in so large a city; that they might lay pipes of all kinds, gas, water, &c., through them.

The following authorities show this interpretation to be correct: *Regan, et al., vs. City of Balto.*, 5 *G. & J.*, 374. *Moale vs. Mayor & C. C. of Balto.*, 5 *Md. Rep.*, 314. *Mc-Clellan vs. Graves*, 19 *Md. Rep.*, 369. *Mayor & C. C. of Balto. vs. Eschbach*, 18 *Md. Rep.*, 276.

We refer also to several cases in the New York Reports, because an examination of them shows that the same system of condemnation there prevails; and it is in these cases distinctly held, that in order to render a street that has even been fully marked out, and in fact opened on the ground, (that is, used as a street,) a street in law and technically, the fee must in some way be vested in the city. *Matter of Seventh St.*, 1 *Wend.*, 262. *Matter of Lewis St.*, 2 *Wend.*, 472. *President, &c., of Brooklyn, vs. Patchen*, 8 *Wend.*, 77. *Livingston vs. Mayor of N. Y.*, *Id.*, 85 and 103.

These cases are cited and approved of on kindred points

46      v.23.

in the cases of *Alexander, et al., vs. Mayor & C. C. of Bal-timore,* 5 *Gill,* 383. *White vs. Flanigan,* 1 *Md. Rep.,* 540.

We contend, therefore, that before any street can be con-sidered as a "formally condemned street," within the pur-view of the Rev. Ord. No. 15, 1850, the title to the bed of that street must have, by some means, been taken out of the original individual proprietors thereof, and vested in the city absolutely and in fee, in trust, of course, for the public, and for public purposes. Was such the case with the Belair road on the 25th of July 1853?

The Belair road was made as provided for by the Act of 1791, ch. 70, and a return and plat was filed in Baltimore County Court in 1793, which are in evidence in this cause, and was thus made a public county road.

It is clearly established that their fee-simple title to the soil, of the owners, under the bed of the road, was unaf-fected by the establishment of this road; its establishment gave to the public only the easement of a right of passage over it as a public road for their vehicles, &c. *Bosley vs. Susquehanna Canal,* 3 *Bland,* 67; 1 *Wend.,* 262; 8 *Wend.,* 85 and 103; and 2 *Wend.,* 472, above referred to.

The status of the Belair road, and of the rights of those owning the ground bounding thereon, being thus estab-lished and defined, must always remain the same, till changed by some valid public law, or by the act of the said co-terminous proprietors.

It follows, therefore, in the absence of any such act or law, that the Belair road was not a "formally condemned" street, within the meaning of the ordinance No. 15, Rev. Ord. 1850, and that, therefore, the paving proceedings are void and *coram non judice.*

1. No Act of Assembly of the kind named is pretended to exist; nor would it have been valid, unless provision had in it been made for paying to these co-terminous proprietors the value of the bed of the road thus appropriated.

The fee remaining in them could not be divested or taken for public use, except by making compensation. 5 *Md.*

*Rep.*, 314, and 19 *Md. Rep.*, 352, above referred to, and *Stewart vs. Mayor & C. C. of Balto.*, 7 *Md. Rep.*, 500.

2. We are at a loss to imagine what act of the parties can be relied on as amounting to a transfer to the city of Baltimore either the fee in the ground covered by the bed of the road, or any right, control or power whatever over the same. The simple fact is, that people continued to travel over it after it got in the city limits as they had done before. This they had the right to do under the Act of 1791, ch. 70.

Adverse possession, for a certain length of time, is held to be evidence on which we may found a presumption of a grant; but this is because the possession is inconsistent with the title in the party possessed against. But here the use of this highway was the right of the public, under the Act of 1791, ch. 70. It required no assent from the proprietors of the ground, and therefore that user is not indicative of the giving up of any right of such proprietors.

But even if the Belair road never had existed there, and the ground was admitted to have been used ever since the street was laid down on Poppleton's plat, in 1817, this would not make the street so opened and used a "condemned street," within the Ordinance No. 15, of 1850. No one can found, upon the permissive user of streets delineated on the plan and actually opened and unpaved, any presumption of the surrender of the rights of soil by the proprietor, or any intention to forego his right to the value of the ground which the street covers, whenever the city goes to work under its ordinances to condemn the said ground for this street. Revised Ords. 1850, Nos. 15 and 17; and 5 *Md. Rep.*, 314; 7 *Md. Rep.*, 510; 18 *Md. Rep.*, 276, above referred to.

If the Belair road ceased to exist when the Extension Act was passed, then the easement created under the Act of 1791, ch. 70, ceased to exist, and the fee was in the proprietors, unencumbered by the easement. *Angell on Highways*, 326. If it did not cease to exist, then it remained

the Belair road on the 25th of July 1853, and was, there-
fore, not a condemned street.

That the ground which has been designated as a street on
the city plan, and opened in fact on the ground, is not never-
theless a street in law, till condemned, or in some way
the fee has been vested in the city, is clear from the follow-
ing authorities; and that its dedication as a street, does not
vest the requisite title in the city, or take the fee out of the
original proprietors: See 5 *Md. Rep.*, 314; 1 *Wend.*, 262;
2 *Wend.*, 472, before referred to; and *Wyman vs. Mayor of
N. Y.*, 11 *Wend.*, 487; *Judges, &c., vs. People,* 18 *Wend.*,
105.

II. We contend that for another reason the Belair Avenue
was not a condemned street of the city of Baltimore on the
25th of July 1853, and this independently of all the grounds
heretofore urged. Belair Avenue was never a condemned
street, between Point Lane and the North Avenue; because,
being a unit, if any part was wanting in condemnation, the
whole did not exist. 19 *Md. Rep.*, 351.

III. We contend that the Belair Avenue was not a con-
demned street on the 25th of July 1853, because the record
of proceedings of the Commissioners for opening streets, as
filed by the defendants, shows that the proceedings were
altogether irregular, and there was an omission of funda-
mental and jurisdictional preliminaries prescribed by law
for the action of the Commissioners. Rev. Ord. No. 17, of
1850; 1 *G. & J.*, 196; 18 *Md. Rep.*, 284; and 10 *G. & J.*,
283, before referred to.

2nd. The application of the 25th of July 1853, was signed
by the professing owners of five thousand four hundred and
eighty feet. The plats and evidence of Martinet show that
the whole number of feet on Belair Avenue, between Point
Lane and North Avenue, is nine thousand five hundred and
thirty-four feet; a majority, therefore, is four thousand seven
hundred and sixty-eight feet.

The application, therefore, represented an excess of seven
hundred and twelve feet. If it can be shown, therefore,

that seven hundred and thirteen feet of the five thousand four hundred and eighty feet professed to be signed for, were not, in fact and law, signed for on said application, then it will result that this application was not signed by a majority, and that, therefore, the whole proceedings relating to the paving were *coram non judice* and void. 8 *Md. Rep.*, 352, and 11 *Md. Rep.*, 186, before referred to. *Bouldin, et al., vs. Mayor & C. C. of Bal'o.*, 15 *Md. Rep.*, 19.

This application was signed by F. L. Hilberg, F. Hilberg, F. Henkelman and W. Leach, as jointly owning one thousand five hundred and five feet. The evidence shows that of this one thousand five hundred and five feet, two hundred and sixty-five feet were owned by F. L. Hilberg, having been purchased some time previously from the owners of a burial ground, which comprised this two hundred and sixty-five feet. The evidence also shows, that the remaining one thousand two hundred and forty feet was purchased and owned as follows:

John H. B. Latrobe, as trustee, appointed by the Superior Court of Baltimore city, in the equity case of *Murray vs. Murray*, and in which case some of the parties were infants, sold the said one thousand two hundred and forty feet of ground, on the 10th of July 1852, under the decree in the case, in the usual form, which decree provided that no deed should be given to the purchaser until all the purchase money was paid. The trustee reported this sale to the Court, reporting as the purchaser, William Leach. The last installment of the purchase money, being over $5,000, was paid to the trustee on the 16th of February 1854, and the deed made on that day to Leach, who, on the 21st of February 1854, together with one George W. Holmes, conveyed the same to F. L. Hilberg, F. Hilberg and F. Henkelman, in which deed it was recited that the purchase money had been, in fact, paid by the grantees in this second deed, and that Holmes had had an equitable interest in the same, by virtue of a contract between Leach and himself for an interest in it.

The counsel then entered into an elaborate review of the testimony, claiming both as to the purchase from Latrobe, trustee, by the Hilbergs and Henkelman, and from Hinckley, trustee, by Mears:

1. That the purchase money not having been paid to the trustees, the purchasers had no right to sign the application to pave. That they were not owners in the meaning of the Acts of Assembly of Maryland, and ordinances of the city, relating to paving streets; that the word "owner" therein, means only the holder of the fee-simple estate, except in the cases specially enumerated in the Act of 1833, ch. 40. See 11 *Md. Rep.*, 186, and Ord. No. 15, (Rev. 1850,) sec. 5.

2. That the application is signed for three hundred and thirty-six feet by "A. L. Boggs, Treasurer;" that the evidence shows that Boggs owned no ground on the Avenue, and that the three hundred and thirty-six feet was owned by the Second Presbyterian Church, of which he was Treasurer, which paid the paving tax assessed to this three hundred and thirty-six feet, and that it is not shown that he had any authority to sign for the Church; nor is the Treasurer of a corporation, the officer that has the power to bind it without an authority from it to him.

3. That the said application is also signed for five hundred and eighty-four feet by "Frederick Rodewald, by H. Von Kapff, attorney;" that this five hundred and eighty-four feet is the ground described in the deed from the Universalist Church to Frederick Rodewald, in trust for Eliza M. Rodewald, wife of Henry Rodewald, and that he was a dry legal trustee, with no power to sign this application. *Hill on Trustees*, 461, 569. *Ware vs. Richardson*, 3 *Md. Rep.*, 505.

4. That even supposing Mrs. Eliza Rodewald did assent to the paving of this Avenue, yet her signature is not to the paper, which must be signed by the owners of a majority of feet. A defective paper cannot be cured by showing that some one assented, whose signature is not attached.

15 *Md. Rep.*, 19. It is well settled, that no ratification of an invalid signature can avail. 8 *Md. Rep.*, 352. And it is very questionable whether even Mrs. Eliza Rodewald could have signed this application. *Williams vs. Donaldson*, 4 *Md. Ch. Dec.*, 68, 414. If the ground represented by the signatures of Boggs (336) and Rodewald, is struck off, then there was no majority.

3rd. The grade of Belair Avenue for a considerable portion of it between Point Lane and North Avenue, was established in January 1851. It was changed on the 19th of December 1853, on the application of those professing to own a majority of front feet between Choptank street and Ann street, between which points the grade was to be changed. We do not deny that this application was signed by a majority, provided Hilberg, Henkelman and Hilberg, had authority to sign; which question we have already discussed under our second point. The law requiring the assent of a majority, is in the Act of 1829, ch. 114.

4th. By the 22nd section of Ordinance No. 11 of Revised Ordinances 1850, it is made the duty of the Collector, before he sells land for taxes, to give a preliminary notice of four weeks; and, by the 24th section, he may, after the expiration of this notice, advertise the land for sale, if the taxes are not paid.

The Ordinance No. 10 of 1855, section 8, makes it the duty of the auditor to collect all accounts for taxes which shall have been standing for a year; and in the collection of the same, he is to proceed in the same manner as is provided by ordinance for the regulation of the City Collector.

The auditor in this case omitted to give the preliminary notice required by section 22nd of Ordinance No. 11, Revised Ordinances 1850; and therefore, the advertisement of sale shown in the complainant's exhibit A. J. B., No. 1, was properly enjoined by the Court on the filing of this bill.

BOWIE, C. J., delivered the opinion of this Court:

When this case was before this Court, upon a former ap-

peal, from an order dissolving an injunction, on a motion to dissolve, in a case heard upon bill, answer and proof taken under the Act of 1835, ch. 380; the order dissolving the injunction was reversed, because the equity of the bill was not fully denied by such an answer as could authorize the passage of the order appealed from. *Vide,* 15 *Md. Rep.*, 18 to 22.

In the opinion of the Court announcing that conclusion, it is declared, to be the established doctrine, that unless the owners of a majority of the feet fronting on a street to be paved, assent in writing to the paving, the proceedings of the city authorities, directing the paving to be done, are null and void, and a Court of Equity has, upon application of the non-assenting owners, *jurisdiction* to prevent, by injunction, the sale of their property to pay for such paving; for which they refer to *Holland vs. The Mayor, &c.,* 11 *Md. Rep.,* 186. That case turned on the 1st section of the Ordinance of 1850, No. 15, and the Acts of Assembly therein. The same doctrine referred to, is reaffirmed in the more recent case of *The Mayor, &c., vs. Eschbach,* 18 *Md. Rep.,* 281, in which, referring to the same ordinance, it is said: "The City Commissioner, by the 1st, 34th, 35th and 36th secs. of Revised Ordinance No. 15 of 1850, with the approbation of the Mayor, is vested with power and authority, to enter into and make contracts for grading and paving, and to assess taxes therefor, in two classes of cases only : 1st, when the proprietors of a majority of the feet of ground, binding and fronting on *any condemned street,* lane or alley, make application to him in writing to have such street, lane or alley graded and paved; and, 2nd, when *all* the proprietors of the ground fronting on a street, lane or alley, *not formally condemned,* make a like application for grading and paving."

The learned Judge assigning the reasons for the decree now appealed from, and under consideration, relies upon the cases last cited, viz : "It being apparent in this case, that the application to pave the Belair Avenue was not

signed by all the proprietors of ground bounding on said Avenue. I will sign a decree overruling the motion to dissolve the injunction, and making the injunction perpetual, upon the principle announced in the *Mayor & C. C. of Balto.*, *vs. Eschbach*, 18 *Md. Rep.*, 276; that as the street in question was not to be considered as a condemned street, on the true construction of the Revised Ordinance of 1850, No. 15, secs. 1 and 36, the City Commissioners had no power," &c.

In Eschbach's case it was admitted, that Hull street from Fort Avenue to the Port Warden's Line, was never formally condemned, and that the application to have it graded and paved, was made by only a part of the proprietors of the ground binding and fronting thereon; hence, in the language of the Court, "it was obvious that the application was not sufficient to bring the case within the jurisdiction conferred by the ordinance on the Commissioners," "nor to give him any official discretion or authority to take any proceedings, or make any contract respecting it." That was also an action at law, in which the plaintiff had to stand or fall upon strict legal and technical grounds. In this case, all these jurisdictional facts are disputed, and to be established by the appellee, seeking the injunction against proceedings which are *prima facie*, presumed to be legal and regular.

The appellants insist that Belair Avenue, being already a condemned street to the extent of forty feet, the notice preliminary to the exercise of the power of widening it, was legally sufficient; and when the street had been widened, under Ordinance No. 61, of 1851, it was, to all intents and purposes, a formally condemned street, to which the regulations prescribed for that class of streets properly applied. The appellees maintain the converse of these propositions, alleging that the notice that application would be made to *widen* Belair Avenue, &c., as laid down on Poppleton's plat, &c., could not be made to cover the bed of a street or highway of forty feet already existing, but applied only to

47      v.23.

the enlargement of the width of the street from forty to fifty feet.

These objections involve 1st, the authority to widen; 2nd, the right to pave.

The Act of 1838, ch. 226, sec. 1, invests the Mayor and City Council of Baltimore with power and authority to provide for laying out, opening, extending, *widening*, straightening or closing up, in whole or in part, any street, &c., within the bounds of said city, which, in their opinion, the public welfare or convenience may require; to provide for ascertaining damages and benefits, and for assessing and levying, either generally on the whole assessable property within said city, or *specially* on the property of persons benefited, the whole or any part of the damages and expenses which they shall ascertain will be incurred in locating, opening, extending, widening, &c.; to provide for granting appeals, for jury trials, &c.; provided, nevertheless, that before the Mayor and City Council proceed to execute any of the powers vested in them by that Act, at least sixty-days' notice shall be given of any application which may be made for the passage of any ordinance, by advertisement in at least two of the daily newspapers in the city of Baltimore.

The powers granted by this Act, are such as are essential to the existence and expansion of a great municipality, and confided to a local legislature, selected by its citizens for the government of its concerns. It would be fatal to the objects for which these powers are delegated by the General Assembly of the State, to require all the notices of the application for ordinances to carry into effect these powers, to specify with technical precision the objects for which the applications will be made. Such particularity would embarrass all the subsequent proceedings dependent on the notices, and render the rights acquired under them so precarious as to destroy all confidence in the local legislation of the city.

The notice in this case was, in our opinion, a sufficient

compliance with the proviso of the Act above cited, in accordance with which Ordinance No. 61, of 1851, was passed by the Mayor and City Council. The authority conferred by this ordinance on the Commissioners, "to widen and condemn North Gay street, or Belair Avenue, to the width of which it is laid down on Poppleton's map," was a legitimate exercise of the power conferred by the Act. Such being the case, it follows that the proceedings of the Commissioners, under that ordinance, are subject to the regulations of Ordinance No. 17, approved April 30th, 1850, and Ordinance No. 15, 1850, approved 20th May 1850, under which arises the question, whether Belair Avenue was a "street formally condemned under any law or ordinance?"

What constitutes a formally condemned street, becomes a material question in commencing any proceeding for paving or grading, as in the one case the owners of a majority of the front feet is sufficient; in the other, the unanimous consent is required. This question has not been, as far as we are informed, judicially determined. In the case just cited, the learned counsel for the appellants contended, that, according to the true construction of the laws and ordinances relating to the paving of streets, and especially of Revised Ord. 1850, No. 15, secs. 1 and 36, a majority was sufficient to vest jurisdiction in the City Commissioner, in every case where the *title to the bed of the street* was, at the time of the application, owned by the City Authorities, either by formal condemnation, or by *deed* or *dedication*. *Vide Dulany's Argument*, 18 *Md. Rep.*, 277.

The 1st and 36th sections of the ordinance, upon the true construction of which the decision in this case mainly depends, will be better understood when placed in *juxta position*. The ordinance is entitled: "An ordinance establishing a system for grading, paving and re-paving the streets," &c. Sec. 1 enacts, "that when the City Commissioner shall receive an application, in writing, for paving to be done in any unpaved street, &c., from the proprietors of the majority of the feet of ground binding and fronting on such

street, &c., or the part thereof to be paved, it shall be the duty of the Commissioner to give seven days' public notice, by an advertisement in one or more newspapers in the city of Baltimore, of the fact of such application, as also of the time and place when said Commissioner intends to act, for the purpose of determining on such application.'' In this section no distinction is made between condemned and un-condemned streets.

Sec. 36 enacts, ''that the several regulations prescribed by ordinance relative to streets, shall be construed to extend to *all* streets, lanes and alleys which are opened, but which have not been *formally condemned as public*, as fully as to any streets, lanes or alleys which have been regularly condemned, in pursuance of *any* law or ordinance, provided the proprietors of all the lots binding on such street, lane or alley shall assent to the extending of such regulations.''

The distinction here made is between streets opened, but not *formally condemned* as public, and streets which have been regularly condemned in pursuance of any law or ordinance. ''Condemned as public,'' must be synonymous with ''appropriated to the public,'' or ''streets belonging to the public;'' the means being put for the end.

Condemnation of streets, is one of the means of extinguishing the private right or title of the owner of the land, and vesting it in the public. Where that title has been transferred, the subject matter to be graded or paved, being already public property, the owners of a majority of front feet are deemed most competent to judge of the expediency of the proposed improvement. On the other hand, where the bed of the proposed road is still private property, every proprietor to be affected by the change, must be consulted and consent. Hence it was said, in *Moale's case*, 5 *Md. Rep.*, 322: ''We hold, that a person owning a lot lying on the bed of the street which is taken for public use, is entitled to be compensated for it precisely as if no street was opened over it. Of course this view is wholly independent of all question of dedication. In such a case, there could be no

claim for damages, for the party having given the ground to the community, can set up no just claim to be compensated for it.''

To require the process of condemnation by inquest (the legal mode of exercising the right of eminent domain) to be resorted to, where the property was already in the public, would be such an anomaly as the law could not intend. There would be nothing for such an inquest to find, no damages to assess; an idle ceremony, productive only of costs and delay; hence such an interpretation is not to be adopted, unless inevitable. The decision in *Kane vs. Mayor, &c.*, 15 *Md. Rep.*, 249, shows that the title acquired by condemnation, is not an absolute, unqualified fee, but an appropriation of private property to public use, consistent with the objects of the Corporation for which it is condemned. This right had already been acquired by the city in so much of Belair Avenue as was a public highway prior to the ordinance directing it to be widened and condemned. See Act recognizing Poppleton's map.

The question, who is a "proprietor" or "owner," within the purview of the 1st and 36th sections, on whose application the Commissioner is to determine to grade or pave, is not without difficulty.

The Act of 1833, ch. 40, entitled, an Act for re-paving streets, &c., in the city of Baltimore, declares, in sections 3, 4 and 5, "that a tenant for ninety-nine years, renewable forever, and the executor or administrator of such tenant, a mortgagee in possession, or the guardian of an infant owner, shall be deemed and taken as an owner within the meaning of that Act." In *Holland vs. The Mayor, &c.*, 11 *Md. Rep.*, 196, this Court determined, although the power to pave an unpaved street was not vested in the Corporation by that Act, yet, it being in *pari materia*, the Legislative definition of the word "owner," therein, was to be applied to its synonyme, "proprietor," as used in the Acts of 1797, ch. 54, and 1817, ch. 148, and which has been adopted since in the Revised Ordinances of 1850, No. 15, establishing the system for grading and paving.

The reasons which induced this legislative declaration of the estate, interest or office which would constitute an owner, must weigh with this Court in interpreting the same word, or its synonyme. It does not require an absolute, legal and equitable estate in fee, yet there must be such an interest as would protect the property to be affected from incumbrances which would prejudice the tenant in reversion, and secure to the city a full right of way. The presumption of law is, that the improvement to be made will enure to the benefit of the majority, and promote public convenience. Those who have such a stake in the subject matter as that they could not encumber it without injury to themselves, would therefore be qualified to apply; if their title is an equitable title, in fee, depending on contract to be consummated, such an interest would be enough to protect the interest of the vendor from prejudice, by wanton applications. An equitable estate, in fee, accompanied by possession, or an interest equivalent to that of a tenant for ninety-nine years, renewable forever, an executor or administrator of such, or mortgagee or mortgagor in possession, or a vendee under a deed of trust, who subsequently acquires a title to the fee, would be an owner or proprietor. To require an absolute unencumbered legal estate in fee, would arrest all improvement.

We think, therefore, that the title of Messrs. Leach, Hilberg and Henkelman was such as authorized them to sign for the number of feet represented by them. The act of the treasurer of the Second Presbyterian Church, was ratified and confirmed by their subsequent payment of the tax levied on them, which was equivalent to the most formal and legal prior authority, *"omnis ratihabitio mandato æquiparatur."*

The signatures of Rodewald, by Van Camp, were made in pursuance of an express verbal request, by the trustee and *cestui que trusts*. Such authority would have been sufficient in law to bind their interests in a contract for sale made by their attorney—the authority of the *agent* need not be in writing, to bind the principal in such cases.

The argument, *"ab inconvenienti,"* that purchasers might, before payment of their purchase money, by signing such applications, encumber the property purchased, is met by the consideration, that vendors may guard against such incumbrances by proper stipulations in the contracts of sale, or taking such indemnity as would entirely protect them; whereas, the absence of this power or right to sign, might retard almost indefinitely the development and prosperity of the most valuable sections of the city.

The 4th point of the appellees, and 5th of the appellants, involve the construction of the 8th section of Ordinance 10, of 1855, being an ordinance supplementary to an ordinance providing for the appointment and compensation, and prescribing the duties of an Auditor. Without recapitulating the section, it is sufficient to say, that, in our judgment, the interpretation given by the counsel for the appellee was correct, that it did not require re-advertisement by the Auditor to enable him to proceed to enforce the collection of the taxes, under the circumstances of this case, the previous notice having been given by the Collector, as required by the ordinance as then existing.

The objections made to the legality and regularity of the proceedings of the Commissioner, under the 2nd and 4th sections of Ordinance No. 17, are such as could properly have been reviewed by appeal under the 9th section of that ordinance—to which the language of the late learned Chief Justice Dorsey, in the case of *The Methodist P. Church vs. The Mayor, &c.,* 6 *Gill,* 402, applies: "To sustain a Court of Equity in the exercise of such powers, would be to confer on it appellate jurisdiction, where it is incompetent to administer justice, and render full and adequate relief to all concerned, on whose rights, if it act at all, it ought to adjudicate."

The conclusion from these premises is, that, in our opinion, the learned Judge below erred in continuing the injunction in this case, and making the same perpetual, and that the decree of the 6th of July 1864, to that effect, should