MAYOR AND COUNCIL OF POCOMOKE CITY *v.* STANDARD OIL COMPANY ET AL.

[No. 54, January Term, 1932.]

*Decided April 13th, 1932.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Godfrey Child and James M. Crockett,* for the appellants.

*Rowland K. Adams* and *L. Paul Ewell,* with whom was *O. Bowie Duckett, Jr.,* on the brief, for the Standard Oil Company, appellee.

*John Watson, Jr.,* for other appellees.

OFFUTT, J., delivered the opinion of the Court.

Pocomoke City is an incorporated town located on the main highway which runs north from Cape Charles, Virginia, to Maryland, and there becomes a part of the Mary-

land state road system. It is a busy thriving country town of some twenty-five hundred or three thousand inhabitants, located in Worcester County near the southern boundary of the Eastern Shore of Maryland, and is the center of much of the commercial and business life of that part of this state, as well as of that part of the Eastern Shore of Virginia lying immediately south of it.

Its principal thoroughfare is Market Street, which is a link in the Maryland state road system, and over it passes much of the local traffic from both Maryland and Virginia, as well as through traffic between points in and south of Virginia and points in and north of Maryland. It runs in a general direction from the southeast to northwest, and the greater part of the commercial, financial, and amusement interests of the town are located on that part of it which lies between Front Street and Second Street, two blocks south. Between Front and Second Streets is Clark Street and these three streets, Front, Clark, and Second, all intersect it, and on the two blocks between Front and Second there are nineteen store buildings, two theatres, two banks, an office building, and a miniature golf course. On the southwest corner of South and Market Streets there is a garage and filling station, known as Wessell's Garage, on the northwest corner of Market and Front Streets there is another filling station known as the Atlantic station, on the northeast corner across the street from the Atlantic station is the Peninsula Produce Exchange, and adjacent to that on the east is the post office. One block north of Front Street Market Street ends at the Pocomoke River, and south of Second Street it is residential in character. Traffic approaching the town from the south first passes Wessell's Garage, and traffic from the north the Atlantic station. There are on Front Street, on either side of Market, "stop" signs warning vehicular traffic on Front Street to come to a stop before entering Market Street. Market Street between those two points is seventy-two feet wide, of which forty-eight feet is taken up by the roadway and twenty-four feet by sidewalks twelve feet wide on either side. Automobiles are permitted to park on each side of the

roadway at an angle of about forty-five degrees, and when that parking space is occupied there remains a clear space or lane for traffic something over twenty-four feet wide.

The town, theretofore known as Newtown, was incorporated by chapter 253 of the Acts of 1878 under the name of the "Commissioners of Pocomoke City," and by that act a board of five commissioners was created and given power to pass such ordinances as might be required for the regulation and good government of the town and the inhabitants thereof. From time to time amendatory acts were adopted under which the name of the municipality was changed to the "Mayor and Council of Pocomoke City," and the powers of its legislative branch more clearly defined.

Assuming to act under the powers granted by certain acts of the Legislature, to which more particular reference is made below, the Mayor and Council on June 7th, 1915, passed an ordinance known as "Ordinance No. 8, Series C," "regulating building operations" within the corporate limits of Pocomoke City, which provided in part that after its passage no building or other structure should be erected within those limits without a permit from the town clerk, to be issued on the order of the Mayor and Council; that such permits should be granted only upon the written application of the owner of the proposed structure, in which was stated the location and construction details of the structure to be built, and the use to be made of it when completed; and that, if the Mayor and Council upon such application should believe "the building or structure to be, in all respects a proper one to be erected at the location named," they should order a permit issued for its erection.

After the passage of that ordinance, there was at least one application for the erection of a gasoline filling station on Market Street, between Front and Second, and after some consideration of the question the Mayor and Council, as an expression of a general municipal policy, on March 1st, 1929, adopted Ordinance No. 63, Series C, which provided that:

"No person, firm, corporation, or association of persons, shall erect, construct, operate or maintain any station for the sale of gasoline, oils, greases, etc., commonly known as a 'Filling Station,' on Market Street, in Pocomoke City, Worcester County, Maryland, between the northwest side of Second Street and the southeast side of Front Street; and that no permit for the erection, construction, operation, or maintenance of the same shall be issued by the said Mayor and Council. * * *

"That any such station for the sale of gasoline, oils and greases, commonly known as 'Filling Station,' erected, constructed, operated or maintained within the aforesaid limits shall be and constitute a public nuisance; and upon the order of the said Mayor and Council, may be abated and removed by the Chief of Police of Pocomoke City."

Following the passage of that ordinance, the Standard Oil Company of New Jersey appeared at a regular meeting of the Council, and presented an application for a permit to erect a filling station at the southeast corner of Front and Market Streets, but, while it was given a hearing, it was not permitted to file the application. Thereafter, on September 2nd, 1929, it did file its written application for the permit with the Mayor and Council, who after a hearing refused it, and on March 18th, 1930, the appellant filed in the Circuit Court for Worcester County a petition for a writ of mandamus, in which, after stating in substance the facts to which we have referred, it prayed that a writ of mandamus be issued directed to the Mayor and Council of Pocomoke City, commanding them to issue to the applicant a permit for the erection of the filling station. The defendants answered, the case was heard on March 24th, 1931, by the court without the intervention of a jury, upon petition, answer, replication, and testimony, and on October 15th, 1931, the court ordered the writ of mandamus to issue, and from that order the Mayor and Council of Pocomoke City appealed to this court.

In the course of the trial the facts stated above appeared without contradiction and may be taken as established, and it also appeared without contradiction that the petitioner held the lot, described in the application, under a conditional contract of sale with Lillie B. King and John Watson, Jr., Esq., substituted trustee, who intervened as co-petitioners, which will become void unless the permit is issued, and there was evidence that a greater volume of traffic passes Wessell's Garage than over that part of Market Street between Front and Second Streets.

The first and most important question presented for the consideration of this court is whether Ordinance No. 63, Series C, is a valid exercise of the power delegated to the appellant by the several acts of the General Assembly of Maryland referred to above, for, if it is, it is a complete answer to the appellee's petition, and the right of the municipality to refuse the permit under the provisions of Ordinance No. 8, Series C, need not be considered.

The effect of the ordinance was to impose certain use restrictions on all property bounded by Market Street between Front and Second Streets. The prohibited use was not such as to create a nuisance *per se* (*Smith v. Standard Oil Co.*, 149 Md. 70, 130 A. 181); therefore its prohibition can only be justified on the ground that it is a legitimate exercise of the police power of the State. The nature and extent of that power is not susceptible of precise definition, nor reducible to any exact or final formula, but must rather be gathered from its application to the varying facts of actual cases as they arise. To define it or to prescribe its extent would be to instantly reduce the doctrine to the unyielding and permanent rigidity of a statute or a constitutional mandate, and so to destroy its usefulness as an instrument for the interpretation of organic and statutory laws, so as to protect the whole people from evils and dangers which would follow the strict and literal application of such law to actual facts under existing conditions. It rests in the end upon the maxim that the safety of the people is the highest law, and

upon the principle that self-preservation is the first law of nature.

It has, in recent years, especially in its relation to various phases of zoning legislation, been the subject of careful, critical, and extensive examination in this court, and, in spite of some confusion, and some apparent conflict, the result has been to establish certain general principles, definite as to their elements, but flexible as to their application, which serve with reasonable certainty to guide the courts in applying the doctrine to concrete cases. The difficulty in its application lies not so much in its nature as in its limitations. It may be regarded as settled that the power can only be invoked to protect the health, comfort, morals, welfare, or safety of the public (*Goldman v. Crowther,* 147 Md. 293, 128 A. 50; and cases cited therein), but doubt arises as to how far, for even such a purpose, it can prevail against plain and positive constitutional mandates. As stated in *Eubank v. City of Richmond,* 226 U. S. 142, 33 S. Ct. 76, 77, 57 L. Ed. 156: "Necessarily it has its limits and must stop when it encounters the prohibitions of the Constitution," but that rule loses much of its force when considered in connection with the construction, placed on it in the very paragraph quoted ,that: "A clash will not, however, be lightly inferred. Governmental power must be flexible and adaptive. Exigencies arise, or even conditions less peremptory, which may call for or suggest legislation, and it may be a struggle in judgment to decide whether it must yield to the higher considerations expressed and determined by the provisions of the Constitution."

In the course of that struggle the courts have, in applying the doctrine in aid of legislation or governmental acts, wherever possible, avoided any construction which would involve a direct clash between the power and constitutional prohibitions, and, in aid of that intent, have frequently resorted to the expedient of measuring the nature and extent of constitutional rights and privileges, when considered in connection with the precise object in respect to which they are asserted, rather than the extent of the police power.

So that, while the police power cannot be invoked to take private property without just compensation first paid or tendered to the owner thereof, in a case where private property is subjected to restrictions which prevent complete freedom in the use of it by the owner, and perhaps lessen the value it would have if not subject to such restrictions, the question may and frequently does arise, Is the property right protected by the Constitution anything more than a right to hold and use the property subject to restrictions in favor of the public which its location and character render essential to the adequate protection of the public welfare? The natural, logical and almost inevitable answer to that question is that there is no such thing as absolute ownership of property in the sense that it is held free from any possible restrictions of any kind, for, as property owes its value to the protection of the State, it is held subject to the right of the State to impose such restrictions upon its use as may be necessary to enable it to afford that protection. It has upon that principle been consistently held that urban property may, under the police power, be lawfully subjected to restrictions which would not be tolerated with respect to rural property, but in every case the test by which the applicability of the doctrine has been determined is whether the restriction is reasonably necessary for the protection of the public welfare, health, safety, comfort, or morals. If it is not, the doctrine has no application; if it has, it will be applied unless it encounters some plain, positive, constitutional prohibition, to which it must yield as the supreme law of the land.

Primarily the power belongs to the State and is ordinarily exercised by its legislative department, but the right to exercise it may lawfully be delegated to some subordinate agency of the State, such as a municipal corporation (*Tighe v. Osborne,* 149 Md. 359, 131 A. 801), and such an agency may delegate to others the purely administrative duties incident to it (*Id.*), or may itself directly exercise the entire power. Where such an agency acts directly, the only limitation upon its right to exercise the power is that it must act impartially, that any interference by it with the unrestricted use of pri-

vate property must be reasonably necessary to the public welfare, and consistent with the prohibitions of the Constitution. Where the power is exercised directly by the agency or delegate, the validity of acts done under its authority is determined by whether its acts in a particular case are upon the facts of such case reasonably necessary to the protection of the public welfare, but, when any part of it is further delegated by the municipality to subordinate officials, the validity of their acts under it may depend upon whether the grant or delegation to such officials vested them with a complete and uncontrolled discretion, or whether it vested them with mere ministerial and administrative functions, to be exercised in obedience to and in conformity with definite rules, guides and standards. In the former case, the right to use the power in support of an act pretended to be done under its authority is denied, not because the act is not reasonably necessary to the public welfare, but because the delegation of power is too broad and indefinite, while in the second case ordinarily it is permitted, and the sole inquiry is whether acts done under it are reasonably necessary to the public welfare.

The case of *Baltimore v. Radecke,* 49 Md. 217, illustrates the application of those principles in the one instance, and *Easton v. Covey,* 74 Md. 262, 22 A. 266, in the other. The *Radecke* case involved the validity of a city ordinance, which provided that no person should install a steam engine in Baltimore City without first obtaining a permit therefor from the Mayor and City Council, and which further provided that any such permit might be revoked and the person installing the same required to remove it upon six months' notice from the mayor. In construing that ordinance this court said: "But the Legislature has granted ample power of legislation upon the subject of the erection and use of steam engines within the city limits, to the Mayor and City Council of Baltimore, independent of the power 'to prevent and remove nuisances.' They are clothed with the power to pass ordinances 'for the prevention and extinguishment of fires,' for 'securing persons and property from danger or destruc-

tion, and for promoting the great interests and insuring the good government of the city,' and 'to pass all ordinances necessary to give effect and operation to all the powers vested in the corporation of the city.' It has been well said in reference to such general grants of power that, as to the degree of necessity for municipal legislation on the subjects thus committed to their charge, the Mayor and City Council are the exclusive judges, while the selection of the means and manner (contributory to the end) of exercising the powers which they may deem requisite to the accomplishment of the objects of which they are made the guardians is committed to their sound discretion. *Harrison v. Baltimore,* 1 Gill, 264. This discretion is very broad, but it is not absolutely and in all cases beyond judicial control." And, in holding the ordinance inoperative and void, it added: "It lays down no rules by which its impartial execution can be secured or partiality and oppression prevented. It is clear that giving and enforcing these notices may, and quite likely will, bring ruin to the business of those against whom they are directed, while others from whom they are withheld may be actually benefited by what is thus done to their neighbors, and when we remember that this action or non-action may proceed from enmity or prejudice, from partizan zeal or animosity, from favoritism and other improper influences and motives easy of concealment and difficult to be detected and exposed, it becomes unnecessary to suggest or to comment upon the injustice capable of being wrought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration. In fact an ordinance which clothes a single individual with such power, hardly falls within the domain of law, and we are constrained to pronounce it inoperative and void."

In *Easton v. Covey, supra,* the Commissioners of Easton, acting under proper legislative authority, adopted an ordinance forbidding the erection of any building within the town without a permit from the commissioners. Covey applied to the Commissioners for permission to erect a frame stable on a lot in Easton. His application was refused, and

he then sought by a mandamus proceeding to compel the Commissioners to issue the permit. The Commissioners in their answer asserted that the safety of property and the best interests of the town required them to refuse to issue the permit, and their action was sustained by this court as a reasonable exercise of the police power delegated to them by the Legislature. In *Farmers' & Planters' Co. v. Salisbury,* 136 Md. 617, 111 A. 112, a similar question arose, except that in that case the application was for the erection of a storeroom for mixing, storing, and bagging fertilizer, and there, too, the refusal of the permit was upheld by this court. In neither of those cases did the ordinances under consideration limit in any possible way the discretion of the mayor and council, and yet the court in those cases distinguished them from the *Radecke* case, *supra,* on the ground that the ordinance construed in it conferred an unlimited discretion upon a public official.

As pointed out in *Tighe v. Osborne,* 149 Md. 365, 131 A. 801, that distinction was necessarily based upon the fact that the ordinances under review in the *Easton* and *Salisbury* cases conferred upon the identical officials who adopted them the power to execute them, and upon the fact that the Legislature had conferred upon them the right to exercise the police power of the state to protect and secure the health, comfort, safety, and morals of the people of those municipalities. Following *Easton v. Covey, supra,* the validity of legislative and governmental acts imposing building and use restrictions upon real property have been considered by this court in a number of cases, which are reviewed in *Goldman v. Crowther, supra,* in the two cases of *Tighe v. Osborne,* 149 Md. 349, 131 A. 801, 150 Md. 452, 133 A. 465, 46 A. L. R. 80; in *Applestein v. Baltimore,* 156 Md. 40, 143 A. 666; and in *Smith v. Standard Oil Co., supra;* and, as a result of those cases, these principles may be accepted as settled: (1) That restrictions imposed by the State or some agency of the State upon the use of private property cannot be justified under the police power unless they are reasonably necessary for the adequate protection of the public welfare,

safety, health, comfort, or morals; (2) that whether such restrictions are reasonable in fact is a judicial question; (3) that when imposed by competent legislative authority the burden of proof in any such inquiry is upon him who challenges their validity (*Baltimore v. Bouldin,* 23 Md. 328; *Sprigg v. Garrett Park,* 89 Md. 410, 43 A. 813; *McQuillen, Mun. Corp.,* secs. 768, 951); and (4), when they are reasonably necessary for the adequate protection of the public welfare, safety, health, morals, or comfort, such restrictions will be regarded as a valid exercise of the police power unless they contravene some express constitutional prohibition.

In considering the validity of Ordinance No. 63, Series C, therefore, two questions occur: (1) Whether it is within the general scope of the power granted to the Mayor and Council of Pocomoke City; and (2) whether it is a reasonable exercise of that power.

In respect to the first question, there can be no reasonable doubt. By chapter 495 of the Acts of 1916 the Legislature granted to the Mayor and Council the power to pass such ordinances, not contrary to law and in conformity with its charter, as "they may deem necessary for the good government of said town" for the following purposes, to wit, to "protect and safeguard the town generally and every section thereof," "to protect and safeguard the property belonging to the town as a corporate body as well as the property of the residents thereof," to define and abate nuisances, "to prescribe precautions and safeguards against fire, and to define and appoint the parts and sections of the town to which measures of precaution, as well as means for extinguishing fire shall apply," to regulate and prescribe by ordinance as a protection against fire the materials of which buildings shall be constructed, and to require all persons proposing to erect any building in the town to obtain a permit therefor, to regulate the sale and storage of combustible material within the town, to keep in repair the gutters, sidewalks, and roadways of the streets, lanes and alleys of the town, "to preserve peace and order within the corporate

limits," to restrain whatever produces unreasonable annoyance or inconvenience to persons while passing along streets and thoroughfares of the town or that subjects them to the risk against fire and traffic hazards or danger of injury or harm, "and generally to pass all necessary by-laws and ordinances not contrary to law for the preservation of the health, comfort, convenience, morals, cleanliness, peace and good order of the community, and for the protection of the lives and property of the citizens of said town, and for the suppression, abatement and discontinuance of nuisances within the limits of said town." By chapter 446 of the Acts of 1927 they were expressly authorized to pass ordinances to maintain and regulate an adequate police force, to regulate the "location and management" of factories, foundries, and "all other establishments the business or trade of which may become noxious or injurious to public comfort and health," and "to regulate or prohibit" the keeping of any lumber yard and the placing or piling of any combustible material within the fire limits.

These comprehensive and specific grants afforded ample authority for the passage of any ordinance resasonably necessary to protect the inhabitants of the town against fire and traffic hazards.

Nor does the second question, which is whether Ordinance No. 63, Series C, is a reasonable exercise of the power thus conferred present any serious difficulty. In the preamble to that ordinance it is stated that "the erection, construction and operation or maintenance of any station for the sale of gasoline, oils, greases, etc., commonly known as a 'Filling Station,' on Market Street, in Pocomoke City, Worcester County, Maryland, between the northwest side of Second Street and the southeast side of Front Street, will increase the fire hazard, and will also tend to obstruct the free passage of persons and vehicles over and upon the public streets and sidewalks in said section, and will also be injurious to the public health, peace, good order and welfare of the citizens of the town of Pocomoke City," and the evidence given

by both parties affords clear and convincing proof of the soundness and wisdom of that conclusion.

It may be inferred from the testimony and plats in the record that most of the business of the town is concentrated in the two blocks affected by the ordinance, that Market Street, between Front and Second Streets, is at times heavily congested, not only by motor, vehicular, and pedestrian traffic from the town and the surrounding country, but also by through north and south motor traffic. On one corner of Front and Market Streets there is a theater, on another corner a filling station, and on a third the Peninsula Produce Exchange Building, and adjacent to that the post office. Going south from Front to Second Street there are on Market Street the two banks, another theater, and an office building, and in those two blocks there is but one residence and but one vacant lot other than that on which appellee proposes to erect a filling station. For the convenience of the patrons and proprietors of the stores, theaters, banks, and other business houses, parking on both sides of the street is permitted in those two blocks, and when the parking space on each side of it is occupied there remains only a lane about twenty-four feet wide open for traffic. At certain seasons much heavy truck traffic passes over it, at times the motor and vehicular traffic is so heavy that pedestrians have to wait several minutes before they are able to cross the street, and that part of it is constantly used by men, women, and children who have occasion to go to the post office.

While the plans submitted for the proposed station indicate that the station and its approaches will be attractive, substantial, and convenient, and, while it is a matter of common knowledge that many thousands of similar stations are daily and continuously operated under varying conditions without damage or injury to the public or nearby property, nevertheless, because of the highly inflammable character of the materials which they distribute, it cannot be denied that they do to an extent at least increase the danger of fire, and it is equally apparent that the location of such a station in a locality so congested would necessarily tend to

increase the traffic congestion to a point where it might seriously affect the public safety.

In *Standard Oil Co. v. City of Minneapolis,* 163 Minn. 418, 204 N. W. 165, 166, the court, in dealing with a case strikingly similar to this, in sustaining the action of the city council refusing an application for a filling station, said in part:

"Under the ordinance, and as a part of the police power, there is vested in the council a discretion relative to the place where such classes of business may be located within the city limits. No question is raised as to the qualification and fitness of the applicant, it having something like fifty filling stations within the city. The reasons given for withholding the license are that a station at that place would interfere with traffic upon the streets and increase the fire hazard. * * *

"There was direct testimony to the effect that a filling station has a tendency to slow up traffic on the street. If such is the fact, then, in such places there might naturally follow a congested condition. At least such matters were proper for the consideration of the tribunal having the matter in charge and not for the courts. It hardly requires tangible proof to justify a council in acting upon such matters to properly consider the fire hazard. It is common knowledge that the business of maintaining the proposed filling station involves the keeping of large quantities of gasoline and oil, and the dispensing it to drivers of automobiles. The gasoline is stored in large, steel tanks, which are placed about four feet underground. The method of drawing the same from the containers and transferring it to the cars of the buyers is fraught with danger. Gasoline is highly inflammable and a violent explosive, all of which was undoubtedly considered by the council, as well as by the court, in affirming the acts of that body. *Storer v. Downey,* 215 Mass. 273, 102 N. E. 321; *City of Des Moines v. Manhattan Oil Co.,* 193 Iowa, 1096, 184 N. W. 823, 188 N. W. 921."

In *Storer v. Downey,* 215 Mass. 273, 102 N. E. 321, 322, the Supreme Judicial Court of Massachusetts, in sustaining

the refusal of the board of aldermen of Cambridge to issue a permit for a garage, said: "Oil and gasoline, almost inevitably stored and used in them, are so highly inflammable and explosive that they may increase the danger of fire, no matter how carefully the building be constructed nor how non-combustible its materials. Although lawful and necessary buildings, they are of such character that regulation of the place of their erection and use is well within settled principles as to the police power. The ordinance in its terms differs in no essential particular from many others which have been sustained." See, also, *City of Des Moines v. Manhattan Oil Co., supra;* 49 *A. L. R.* 767; 42 *A. L. R.* 978; 34 *A. L. R.* 507.

Contrary to that conclusion, the appellee suggests "that there is absolutely no evidence" to support the charge that the free passage of persons and vehicles would be obstructed by the station. It is, of course, true that there was no evidence that the station has obstructed traffic, because at this time it does not exist. But the conclusion is inevitable that, in view of the present congested condition of Market Street, it will when erected have a tendency to obstruct traffic. Its very existence will be an invitation for patrons to enter the premises, and it may be presumed that, unless appellee expected patronage, the station would not be erected, and the extent to which it obstructs sidewalk and roadway traffic will depend upon the volume of its patronage. The evidence that the traffic over the two blocks in question is congested is unequivocal and uncontradicted, and the decision of the Mayor and Council to avoid, if possible, further congestion, cannot be denounced as arbitrary or unreasonable, in view of the fact that they are directly charged with the responsibility of preserving order in the town and of protecting the lives and property of the inhabitants thereof.

There are cases, several of which have been cited by appellee, which are in conflict with the conclusion which we have reached, such as *Spann v. Dallas,* 111 Tex. 350, 235 S. W. 513; *Standard Oil Co. v. Kearney,* 106 Neb. 558, 184 N. W. 109, and *Williams v. Gage,* 130 A. 721, 3 N. J. Misc.

R. 195, but the weight and the decided trend of authority is the other way. In the case last cited, the Supreme Court of New Jersey held in a *per curiam* opinion that a permit should issue for the construction of a gasoline station in a residential district on the ground that it would not affect the public safety, health, or welfare. But the same court in *Priscoll v. City of East Orange*, 136 A. 803, 5 N. J. Misc. R. 434, said: "Whatever might be said with respect to a building for ordinary mercantile purposes in this location, the court has been almost uniformly averse to overriding the local authorities in the case of public garages and gasoline stations, with their attendant fumes, noises, and fire hazard, in districts generally residential. *Hench v. East Orange* (N. J. Sup.), 130 A. 363 (2 N. J. Misc. R. 510). To entitle a party to a mandamus his legal right must be clear; and applying that rule to such a case as this, the zoning ordinance in its application to relator's case must be clearly shown to be unreasonable." There was no doubt something in the records in those cases which does not appear in the reports to explain the apparent inconsistency, but they are cited to illustrate the danger of relying upon general expressions in opinions without reference to facts upon which they are based.

A further objection to the ordinance is that it is discriminatory, because other gasoline stations are permitted which, while not in the restricted territory, are near it, as Wessell's Garage and the Atlantic filling station. There are two answers to that objection; one is that there are no other garages or filling stations in the restricted area, and, since in defining the restricted area it was necessary to fix its boundaries, the action of the Mayor and Council in limiting it to the two blocks between South and Second Streets was not unreasonable, because the conditions in those blocks justified the belief that the possible fire and traffic hazards incident to a filling station would constitute a greater menace to the public safety and comfort there than in those sections of Market Street north of Front Street and south of Second

Street. For, while there was some conflict in the testimony as to the relative volume of traffic at Second and Market Streets and at Front and Market Streets, it was uncontradicted that, south of Second Street, Market Street is residential in character, and north of Front Street there are few buildings of any kind on it. The second reason is that the very multiplication of such stations might in itself constitute a menace, and that the right to restrain the number permitted to operate in a given territory within reasonable limits is a necessary incident of the police power, to be exercised with a due regard both of private rights and the public welfare.

A further objection is presented by John Watson, Jr., Esq., trustee, and Mrs. Lillie B. King, that, if the permit is refused, they will lose the benefit of their bargain with the appellee, and thereby be unlawfully deprived of the free use of their property. What has been said with reference to the Standard Oil Company applies with equal force to them. They hold their property subject to the right of the State to impose such restrictions upon its use as may be necessary to adequately protect the public health, comfort, safety and welfare. It necessarily derives much of its value from its location in the busiest and most congested part of the town; its owners therefore cannot complain if the very conditions which enhance its value make it necessary to prevent a use of it which under those conditions would menace the public safety, health, comfort or welfare. The power to determine whether the proposed use would have that effect has been properly lodged in the Mayor and Council, for, as said in *Sprigg v. Garrett Park,* 89 Md. 411, 43 A. 813, 815, in reference to certain sanitary regulations: "Who shall have power to decide such matters for the entire population of the town? The power must reside somewhere, so that all may be bound; else, as was said in *Mugler v. Kansas* (123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205), *supra,* 'society will be at the mercy of the few, who, regarding their own appetites or passions only, may be willing to imperil the peace and security of the many, provided only they are permitted

to do as they please.' 'Under our system,' it is said in the same case, 'that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.' In doing this, however, it cannot treat a thing as a nuisance which cannot be one, but it may declare that to be a nuisance which, from its character, may and does become such."

For the reasons stated, upon the facts of this case, the passage of Ordinance No. 63, Series C, by the Mayor and Council of Pocomoke City, was a valid and legitimate exercise of the police power, lawfully committed to them by the Legislature, and it follows that the order of the learned court below in directing the writ of mandamus to issue was erroneous, and must be reversed.

*Order reversed, with costs to the appellants.*