BENNER ET AL. *v.* TRIBBITT ET AL., COMMISSIONERS

[No. 85, October Term, 1947.]

*Decided February 19, 1948.*

8

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*K. Thomas Everngam* and *Marvin H. Smith*, with whom was *George B. P. Ward* on the brief, for the appellants.

*J. De Weese Carter* and *James A. Wise*, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order dismissing a petition for mandamus to require defendants, the Commissioners of Denton, to issue to petitioners a building permit for a filling station on a lot at the southwest corner of Main (or Market) and Fifth Streets. The lot fronts 80 feet on Main Street and 300 feet on Fifth Street. Application for the permit was filed on December 17, 1946, was advertised for two weeks and was denied on February 5, 1947. In response to the public notice seventeen persons had filed objections to issuance of the permit. The petition for mandamus was filed on February 25, 1947. After a demurrer to the petition had been overruled, defendants filed an answer.

Denton is a town of about 2000 inhabitants. Main Street (which runs east and west) is its principal business street. Route 404 is the principal public highway from the Chesapeake Bay Ferry (about 30 miles from Denton) to the lower Eastern Shore and lower Delaware. Route 404 runs through Denton on Main Street from west to east and at Fifth Street (which runs north and south) turns south around the corner of the lot in question.

By the charter of Denton, P. L. L. 1930, Art. 6, sec. 139; Acts of 1914, ch. 730, sec. 86, the Commissioners have power to pass ordinances "for controlling the erection and location of buildings, fences, and stock enclosures", to "prevent and regulate the storage of gunpowder, oil or other combustible matter in such quantities and in such places as they may deem proper" and to provide *"for the good government* and peace, health and welfare *of the town and the inhabitants therein."* (Italics supplied.) Of the clauses quoted the first originated in 1884, the second and the words not italicized in the third in 1914, the italicized words in or before the Code of 1860, P. L. L., Art. 6, sec. 61. The charter, unlike the Baltimore City Charter since 1898, does not delegate plenary authority "to have and exercise within the limits of the [town] all the power commonly known as the Police Power to the same extent as the state has or could exercise said power within said limits." *Cf. Rossberg v. State,* 111 Md. 394, 74 A. 581, 582, 134 Am. St. Rep. 626; *Brown v. Stubbs,* 128 Md. 129, 97 A. 227; *Osborne v. Grauel,* 136 Md. 88, 110 A. 199, with *Bostock v. Sams,* 95 Md. 400, 414, 52 A. 665, 59 L. R. A. 282, 93 Am. St. Rep. 394. The town has no zoning powers and has not attempted to pass any zoning ordinance. The general zoning act of 1927, Code, Art. 66B, secs. 1-9, is applicable only to cities and towns containing more than 10,000 inhabitants; the planning and zoning act of 1933, Art. 66B, secs. 10-37, is expressly inapplicable to Caroline County. Sec. 35 and amendatory acts of 1941, 1945 and 1947. An ordinance of 1907 makes it unlawful to build "any dwelling house, barn, shed, stable, storehouse, warehouse, shop, porch or any other building * * * without first obtaining a permit from the Commissioners". An ordinance of 1937 prohibits construction or repair of "any building of any kind or description * * * without first submitting * * * plans and obtaining a permit from the Commissioners". These charter provisions and building ordinances constitute sufficient grant and exercise of the police power to justify denial of a permit for a

filling station when such action is "reasonably necessary for the adequate protection of the public welfare, safety, health, comfort, or morals". *Pocomoke City v. Standard Oil Co.*, 162 Md. 368, 380, 159 A. 902, 906.

Petitioner Benner, owner of the lot, has contracted to sell it to petitioner Sherwood. The sale is conditioned upon grant of the permit. The petition for mandamus alleges that Sherwood "has planned to erect a suitable, modern and beautiful building thereon (costing at least $25,000), and to landscape and beautify the said lot with shrubs, grass and hedges (which would effectively conceal the service station from adjoining residence), and to so arrange the same, as to conform to all architectural, safety and health standards." Defendants' answer admits that so far as such plans are known to them, they meet defendants' "physical and visual requirements" for the erection of buildings. In an effort to appease objectors petitioners agreed to donate sufficient land at the corner of the streets, "so that a curve would replace the present corner", and also to donate to the town "the land necessary for a public library or building", at the south end of the lot, fronting on Franklin Street (parallel to Main Street) and Fifth Street, "all of which proposed donations met with said Commissioners' stated approval". The petition alleges that defendants on numerous occasions (between December 17, 1946, and February 5, 1947) advised petitioners "that after consideration they believed the aforesaid plans were entirely proper, and the proposed use was in the best interests of the town * * *, and would not in any way affect the public health, comfort, safety or welfare of said town or the adjoining property owners, and that said Commissioners believed the adjoining property owners were misguided in their objections". The answer alleges that "the individual members of the Board did state personally and individually that they saw no objection to the physical plans for the building itself, and also stated that they personally saw no objection to the proposed use of the property, but emphatically deny that they

officially said that the proposed use would not in any-wise affect the public health, comfort, safety and welfare of the town or the adjoining properties, or that said property owners were misguided in their objections. * * * any statements made by any individual members of the Board to [petitioners] were an expression of the personal and tentative thought of the members at that time before full consideration of the matter had been given by them as Commissioners * * *, and were not intended in any manner as a forecast of what their official determination of the application would be after full consideration of the application with regard to the public safety, welfare, comfort, morals and health of all the inhabitants of said town". The petition alleges that on February 1, 1947 defendants advised petitioners "that they were going to hold a public meeting of the pro-testants of said application, solely in order to listen to their complaints and to explain to them the advantages of said building and landscaping, in place of the present weed and filth infested lot * * * but advising that the said permit and application was going to be granted." The answer denies that defendants stated that the sole purpose of the meeting was to explain to the protestants the advantage of the proposed building and landscaping, or that the permit and application was going to be granted, and says the purpose of the meeting was to give the protestants an opportunity to be heard in ex-planation of their previous written objections filed.

The petition alleges that on February 5, 1947, before the meeting was called to order defendants announced that they had decided to "turn down" the permit and application and dismissed the meeting, and when ques-tioned advised that the permit and application were "turned down" solely because the majority of the prop-erty owners in the immediate vicinity objected to any service station, or any other similar building of a com-mercial nature there, as they wanted to keep the neigh-borhood residential; and again advised that they per-sonally favored the application but "had to live with the

12

objectors and therefore had to deny" it. The answer alleges that "practically all of the seventeen protestants were present at the meeting, but it was not deemed necessary to hear explanations of their protests previously filed, for the reason that [defendants] had prior to the meeting, and after full consideration of the matter, * * * determined that the proposed use of the lot * * * would not promote the general welfare, safety, health, morals and comfort of all the inhabitants of the town"; that as petitioners "had been fully and exhaustively heard respecting the merits of the application and no public hearing of the matter was required by law" and "it had been already determined to grant the objectives of the protestants, it was not deemed necessary to conduct the scheduled hearing"; that defendants "have no recollection that either of them stated to any one their reasons for refusing the application", and "while the objection of the majority of the property owners and residents in the immediate vicinity to a service station being operated in that locality was one of the factors which was considered" by defendants in their "determination to refuse the application, such factor was by no means the sole and only basis of [defendants'] determination and that the decision to refuse the application was based on a determination by [defendants] that the proposed use of the property would not promote the general welfare, safety, morals and health of the inhabitants of the town". It is alleged and admitted that defendants had recently issued a permit (without public notice) for the construction of a large nearby garage, for a then member of the Commissioners, on Fifth Street, and also a permit for a large warehouse on Franklin Street, both within seventy-five yards of petitioners' property and "within a short half block thereof". The petition alleges that the "arbitrary and capricious action" on defendants' part in denying the building permit and approval of the plans "was due to no objection to said building plan for a service station, nor to any determination that the same constituted a menace to the public health, comfort, safety

or welfare, but was solely an unwarranted attempt to enforce zoning", and avers that the denial was "arbitrary, capricious, illegal and wrongful" and also denied petitioners the equal right to use their property guaranteed by the constitution and laws of the state and the United States. The answer denies these allegations and says that defendants' decision to refuse the permit "was based on a determination that the proposed use would not promote the general welfare, safety, comfort, morals and health of all the inhabitants" of the town. The answer alleges that the factors considered by defendants in arriving at their decision to refuse the application were, the extent to which the proposed use (a) would probably further congest vehicular traffic at the corner, (b) would create a hazard to pedestrian traffic passing the location, including school children, (c) would create a fire hazard to inhabitants and property owners, particularly residents and owners of frame houses in the immediate vicinity, the extent to which noise and gases incident to the proposed use would be detrimental to the health of the inhabitants of the town, whether there was any public necessity for the proposed use, the extent to which such use would depreciate the value of surrounding residences or affect their use as dwellings, and "whether the proposed use would promote the general welfare, safety, morals and health of all the inhabitants of said town".

Petitioners' replication traverses allegations in the answer, substantially reiterating allegations in the petition and expressly denying (1) that defendants based their refusal to grant the permit on the ground that it would adversely affect, or (2) that (in fact) it would adversely affect, the public health, morals, safety and welfare of the town. Defendants joined issue on the replication.

By agreement four issues were submitted to the jury: Did defendants (1) "officially state they believed that the proposed use of the lot of land mentioned in this case would not adversely affect the public health, comfort,

safety and welfare of the inhabitants of said town?", (2) "on or before February 5, 1947, officially promise and agree to issue the building permit applied for in this case?", (3) "refuse the building permit solely on the ground that the majority of the property owners in the immediate vicinity objected?", (4) "is the vehicular traffic condition at the intersection of Main and Fifth Streets at present congested?" On each issue the jury's verdict was "Yes". Three additional issues proposed by petitioners were "refused" by the court: Would the proposed building and use of the land according to the evidence (1) result in an increased hazard to vehicular and pedestrian traffic, (2) provide reasonable safety to adjacent properties and to persons from fire hazards, or (3) adversely affect the public welfare, health, safety, and morals of the town?

The trial lasted two days. The jury's verdict was rendered on May 16, 1947. On June 12, 1947 the court filed a carefully considered opinion and an order dismissing the petition for mandamus. In its opinion the court said: "Despite the fact that counsel have framed issues for the jury which they and the court as well considered to state the issues of fact made by the petition, answer and replication, I have reluctantly reached the conclusion that the findings of the jury by its special verdict are not material to the ultimate decision of this case". The court also said: "It is apparent that what happened in this case is that when the commissioners were first approached they were of the opinion that the improvement of this lot by a filling station would not adversely affect the welfare of the town and being men in public office were anxious to please the applicants. At that time they had no idea of the vigorous opposition which later developed. They went so far as to commit themselves to the project. Later as the matter became publicly known a strong, active and vociferous opposition developed. The Commissioners were then in a quandary. As one of them said, 'We have to live with these people'. Thereupon they felt required to reverse

their previous opinion. It is clear also that the petitioners knew they did not have final action in the matter right up to the evening of February 5, 1947, when they finally and definitely refused the permit. There is no evidence of fraud nor of any ulterior motive. The actual situation is that the commissioners did not view and consider all of the relevant facts until a public controversy was generated. Under these circumstances I believe that the decision of this case depends upon whether there are sufficient facts in evidence to make the action of the commissioners reasonable. It seems to me that the main issue has been beclouded by the efforts of the petitioners to spell out from preliminary negotiations and commitments some binding obligation or at least some disqualifying conduct rendering the action of the commissioners illegal. Indeed some such notion was entertained by the Court and counsel on both sides in framing the issues and in the trial; but it now becomes clear to me that we were pursuing a collateral or even an irrelevant angle of the case."

In Maryland since the Act of 1858, Code, Art. 60, sec. 7, and apparently since (if not before) 1806, Art. 60, sec. 1; *Eichelberger v. Sifford*, 27 Md. 320, 329, whenever under the Act of 1828, ch. 78, or the Statute of 9 Anne, ch. 20 any issue of fact could be tried on application for mandamus (*Poe, Practice*, 5th Ed., § 711), "such issue of fact shall be tried by a jury if either party desire it; but they may be heard or determined by the court if both parties agree". In the instant case it may be inferred that "both parties agreed" that any material or pertinent issues, other than those submitted to the jury by agreement (and those "proposed" by petitioners but "denied" by the court), not inconsistent with the jury's verdict, might be "determined by the court". It does not appear that "both parties agreed" that any other issues might be determined by the court. If any of the issues submitted to the jury were material or pertinent, the verdict (if supported by evidence) cannot be nullified by contrary findings by the court.

We agree with the lower court that nothing in the preliminary negotiations created, or could create, any binding obligation to issue the permit. Unless "promise and agree to issue" can be construed in a non-contractual sense, *e. g.*, as meaning "give assurance of their intention to issue", the second issue submitted to the jury was immaterial and the verdict unsupported by evidence. We are, however, unable to agree with the lower court as to the significance of the issues submitted or (in the light of the verdicts) of the evidence. The first issue, and the second (if construed non-contractually as suggested), are not decisive but are pertinent as evidentiary support on the third issue, and the verdicts are supported by evidence. The third issue is material and the verdict is contrary to the opinion of the lower court. We think the verdict is supported by evidence and (in connection with the undisputed facts and the verdicts on the other issues) establishes that defendants' action in denying the permit was arbitrary and unlawful.

To determine the legal sufficiency of the evidence to support the verdicts it is not necessary to review in detail the voluminous testimony, since (1) in both the pleadings and the testimony the field of disputed facts is narrow and (2) where there is conflict, the testimony most favorable to the verdict must be accepted. Certain undisputed facts (averred in the petition or the answer but not yet mentioned) were stipulated, and evidence of other facts (not seriously disputed but including statistical conclusions from estimates not very concordant or reliable) was found by the court to be true, *viz:* "A stipulation agreed upon by the parties, filed in the case and submitted to the jury, establishes the fact that the lot in question is located approximately in the geographical and traffic center of the town; that there are 17 separate dwellings on Main Street between Fifth and Sixth Streets and also one Church; that there are 5 dwellings, a tourist home, a duplex apartment house, a store, a garage, a doctor's office and another church on Main Street between Fourth and Fifth Streets; that one dwelling is about

fifteen feet from the proposed filling station; that there are no commercial properties between Fifth and Sixth Streets on Main Street; that two churches are within 75 yards of the lot, a primary public school within 150 yards, a public high school within 300 yards and 6 filling stations within a half mile, three of which are within three blocks. It is also stipulated that Market Street at this point is 27 feet wide and Fifth Street, 29 feet wide. The character of the neighborhood east and south of the proposed building is predominantly residential; and the character of the neighborhood west of the proposed building on Main Street toward the Court House Square is the main business section of the town. The testimony produced establishes that between 2,000 and 3,500 vehicles pass this intersection daily and that on weekends during the summer months this traffic is increased to possibly 4,000; that the average number of school children passing this lot on the sidewalk next to the lot is 135 to 150 daily and passing this intersection between 225 and 250 daily; that between 500 and 600 other pedestrians pass this intersection daily of which 300 to 350 walk on the sidewalk adjoining the lot. The evidence shows that the proposed filling station would store about 8,000 gallons of gasoline under ground. It also shows that entrances from Main Street would be made into this lot across the sidewalk in two places each 28 feet long and two other entrances into the lot from Fifth Street each about 35 feet long.

"Countering the evidence of the Commissioners as to the fire hazard, the petitioners produced an expert who testified that the insurance rate for this type of station would be less than a mercantile establishment; countering the matter of traffic hazard, they offered an expert of the State Roads Commission who testified that the streets at this corner could carry in one hour more cars than normally pass in ten hours and that the State Roads Commission had approved the location of the station. * * * As to such of the facts so far stated and not covered by the stipulation and·not found by the jury,

pursuant to Rule 7 [pt. 3, subd. 3] of the Rules of Practice and Procedure of the Court of Appeals, I find the same to be true". The great majority of structures immediately surrounding the lot are frame constructions, including the one immediately adjoining. For more than thirty years the lot has been unimproved and has been grown with weeds, which in summer reach considerable height and in the fall, when dry, would readily burn. More or less trash also accumulates on the lot.

On the third issue the only disputed fact was whether defendants refused the permit *solely* on the ground that property owners objected. The jury properly might believe—as indeed the court apparently did—direct testimony that immediately after refusing the permit, one defendant in the presence of the other answered this question and said they did not base their decision on any question of public safety, health, morals or welfare, *viz:* "No. The majority of those people down there didn't want it, and we have got to live with them". On the first three issues the jury might also believe direct testimony that defendants previously had said they could not see that a service station of the type proposed would be hazardous to the public health and safety; also testimony that defendants had repeatedly said: they were in favor of the permit and were going to grant it, they were of the opinion it would be a benefit and improvement to the town, not a detriment, the lot was an eye-sore and the town had derived no taxes or other revenue from it, but there was "a lot of opposition against it". From the evidence the jury might have found (differently than the court in its opinion) that defendants first were in favor of the application on its merits and not because "being men in public office [they] were anxious to please the applicants", and later reversed their opinion, not because they did not previously "view and consider all the relevant facts" but because they yielded to the wishes of the objectors notwithstanding lack of merit in the objections. The official minutes of the meeting of February 5, 1947 contain a statement that "in view of the

volume and character of the protest offered, the Commissioners have unanimously agreed to reject" the application, whereupon "the protestants expressed their thanks and appreciation of the action of the Board, and retired." Without overstressing a negative pregnant or any other question of pleading, it may be noted that the allegation, made four times in the answer, that the proposed use of the lot "would not promote the general welfare, safety, health, morals and comfort of all the inhabitants" is not material. A filling station need not be a universal blessing or a "public necessity". It is a lawful private business, not the exercise of a franchise. It is sufficient if it will not adversely affect the general welfare, safety, health, morals or comfort.

On the fourth issue the verdict was that the vehicular traffic condition at the intersection of Main and Fifth Streets is at present congested. With reference to the third and fourth issues the jury from the evidence might have found that, in fact and in the judgment of defendants: This vehicular traffic condition is due principally to parking and consequent difficulty of large trucks turning the corner. This condition would be improved by cutting the southwest corner to a curve and by partly preventing parking on both streets in front of the filling station. There are no traffic lights or traffic policemen in Denton. One defendant testified that he "was never in favor of traffic lights in small towns". In present day life the way of the pedestrian is hard, for both school children and their elders. A filling station, to the extent of its customers, would divert traffic from the corner through its property. Even reckless drivers would be more careful in crossing the sidewalk into or out of a filling station than in turning the street corner at high speed. A filling station, properly conducted, would be less a fire or health hazard than a vacant lot grown with weeds and accumulating trash. These are not findings of fact by this court, but there is evidence legally sufficient to support such findings by the jury. Such findings would corroborate direct

20

testimony that defendants refused the permit *solely* on the ground that property owners objected.

On purely public or political questions regarding exercise of the police power, *e. g.,* regulation or prohibition of liquor traffic or race-track betting or passage of a general building, traffic or zoning laws, legislators may follow the wishes of their constituents. Such action is not subject to judicial review. But in restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of neighbors or for their benefit. Such action is arbitrary and unlawful, *i. e.,* contrary to Art. 23 of the Declaration of Rights and beyond the delegated power of the town of Denton to pass reasonable ordinances. *Storck v. Baltimore,* 101 Md. 476, 61 A. 330; *Eubank v. Ctiy of Richmond,* 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A., N. S., 1123 (cited and quoted in *Pocomoke City v. Standard Oil Co., supra,* and *Goldman v. Crowther,* 147 Md. 282, 128 A. 50, 38 A. L. R. 1455). There is no magic in the word "zoning", but there is a wide difference between exercise of the police power in accordance with a comprehensive zoning plan, which imposes mutual restrictions and confers mutual benefits on property owners, and arbitrary permission to A and prohibition to B to use their own property, at the pleasure of neighbors or at the whim of legislative or administrative agencies.

In *Pocomoke City v. Standard Oil Co., supra,* this court, in sustaining an ordinance which prohibited any filling station within a specified congested area, said that where a subordinate agency of the state, such as a municipal corporation, acts directly (and does not delegate to others) in such exercise of the police power, "the only limitation upon its right to exercise the power is that it must act impartially, that any interference by it with the unrestricted use of private property must be reasonably necessary to the public welfare, and consistent with the prohibitions of the Constitution". 162 Md., at pages

376, 377, 159 A. at page 905. The court also said, that, as a result of cases cited, "these principles may be accepted as settled: (1) That restrictions imposed by the state or some agency of the state upon use of private property cannot be justified under the police power unless they are reasonably necessary for the adequate protection of the public welfare, safety, health, comfort, or morals; (2) that whether such restrictions are reasonable in fact is a judicial question; (3) that when imposed by competent legislative authority the burden of proof in any such inquiry is upon him who challenges their validity, *Baltimore v. Bouldin,* 23 Md. 328; *Sprigg v. Garrett Park,* 89 Md. [406], 410, 43 A. 813; *McQuillen, Mun. Corp.,* secs 768, 951; and (4), when they are reasonably necessary for the adequate protection of the public welfare, safety, health, morals, or comfort, such restrictions will be regarded as a valid exercise of the police power unless they contravene some express constitutional prohibition." 162 Md. at pages 379, 380, 159 A. at page 906. In *Engle v. Cambridge,* 180 Md. 82, 87, 22 A. 2d 922, 924, in affirming dismissal of a petition for mandamus to compel the City of Cambridge to grant a building permit for a garage under an ordinance similar to the Denton ordinances, the court said that "the inquiry resolves itself into whether the power has been honestly exercised, or whether action on the part of appellee was arbitrary. In this case no arbitrary conduct on the part of appellee is suggested, * * *". In *Mayor and City Council of Baltimore v. Biermann,* 187 Md. 514, 50 A. 2d 804, a comprehensive metropolitan zoning statute and ordinance originally contained an absolute prohibition of permits for filling stations except by special ordinances. Later the prohibition was qualified by authority to the zoning board, subject to veto by a minority of the board, to grant a permit. The court said that, on the question whether in a particular case the result of the qualified prohibition and the veto is beyond the police power, "the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action,

22

even if the legislative body acted without evidence at all". 50 A. 2d at page 808. In *Hoffman v. Mayor and City Council of Baltimore*, 187 Md. 593, 51 A. 2d 269, 273, a case under the same statute and regarding action by the board (not a veto by a minority), the court referred to "the strong presumption that denial of a permit for a filling station, whether by legislative or administrative action, is within the police power", and also said that "whether the reason given by the Board is correct or not, it is none the less true that if its conclusion was correct it will not be set aside, even if the reason given therefor is wrong". There was no contention that the board in the *Hoffman* case—or the vetoing minority in the *Biermann* case—acted arbitrarily to please objectors, contrary to their own judgment on the merits. In the *Hoffman* case the court was "unable to find" that the board's decision was "discriminatory, unreasonable, arbitrary or not founded upon substantial facts". *Supra.* There is no presumption that arbitrary action reaches a "correct" conclusion. In the instant case we think the presumption and the burden of proof referred to in the *Pocomoke City, Biermann* and *Hoffman* cases was overthrown by the verdict of the jury, supported by evidence.

The facts in the instant case present no problem regarding the feasibility of ascertaining the reasons for action by a large legislative body, or the right to compel one or many legislative or administrative officials to testify as to their reasons. *Hyman v. Tyler*, 188 Md. 301, 52 A. 2d 610, 611, and cases cited. Even in construing acts of Congress, resort to the debates, though formerly forbidden (*United States v. Trans-Missouri Freight Association*, 166 U. S. 290, 318, 17 S. Ct. 540, 41 L. Ed. 1007), has long been permitted (*Standard Oil Co. v. United States*, 221 U. S. 1, 50, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A., N. S., 834, Ann. Cas. 1912D, 734) and in recent years has been carried to considerable lengths. Recitals of legislative purpose in statutes have been considered by this and other courts, though not

necessarily as conclusive. *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 267, 268, 101 A. 710; *Schechter Corp. v. United States,* 295 U. S. 495, 534-537, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947. In the instant case both members of a legislative, executive and administrative body of two (there being one vacancy) repeatedly discussed the matter over a period of seven weeks before action, stated (or so the jury might find) their reason immediately after action, fully stated their alleged additional reasons in their answer, and testified at length on the subject, as witnesses on their own behalf. We think the evidence (including cross-examination of defendants) was competent, pertinent and (as we have said) legally sufficient.

Apparently the lower court was of the opinion and defendants now contend that petitioners must show, and have failed to show, (1) that defendants could not reasonably have found or, at least, (2) that it was not a fact, that the proposed use would adversely affect the public health, comfort, safety or welfare. If we should approve the second contention, it would be necessary to remand the case for a new trial, since that question of fact was presented by the "additional issues proposed" by petitioners, approved by defendants and refused by the court. We may assume for sake of argument that (*a*) the court ought not to compel issuance of a permit if the proposed use would adversely affect the public welfare, and, apart from the jury's verdict, (*b*) the first contention would be sound if defendants had not acted arbitrarily and (*c*) there is legally sufficient evidence to support the first contention. But we think the verdict of the jury, destroying as it does the hypothesis of assumption (*b*) and the presumption on which assumption (*c*) is based, in connection with the undisputed evidence, in effect negatives both contentions. Defendants testified that they have no personal objection to the proposed use, they were in favor of the permit; one of them does not know that there would be any difference between their personal feelings in this matter and their official feel-

24

ings; they find no difference between personal and official statements or judgments except that official statements or judgments would have to be recorded or made in the town office. The verdict that they refused the permit *solely* because neighbors objected carries the necessary implication that their judgment on the merits was in favor of the permit. We find no evidence to support a conclusion that the proposed use was in fact adverse to the public welfare if in defendants' judgment it was not.

The second contention just mentioned is also urged by defendants in support of their demurrer to the petition. For the reasons already stated, this ruling was not prejudicial to defendants, especially after joinder of issue on the replication, which clearly makes the allegation claimed to be lacking in the petition.

On the verdict of the jury petitioners are entitled to the writ of mandamus as prayed.

Appellees moved to dismiss this appeal for failure of appellants to furnish, within ten days after the filing of the transcript of the record, a statement of the parts of the record they proposed to print with their brief, as required by Rule 39, sec. 2. The transcript was filed on August 27, 1947. On July 9th appellants had furnished appellees a designation of the matter to be included in the record. On September 11th the motion to dismiss was filed. On September 13th, when the matter was called to appellants' attention, they furnished appellees a statement of the parts of the record to be printed, which was identical with the designation of July 9th. The delay of seven days was due to oversight. It is not suggested that appellees were prejudiced by the delay. Argument of the case was not delayed. Rule 39 does not require this court to dismiss the appeal. The motion is is overruled.

*Order reversed, with costs, and writ of man-*
*damus directed to be issued as prayed.*